UNITED STATES of America ex rel. Keith WEBB, Appellant,

v.

COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, the District Attorney of Philadelphia County.

No. 74–1980.

United States Court of Appeals, Third Circuit.

Argued March 5, 1975.

Decided May 13, 1975.

As Amended June 9, 1975.

Louis M. Natali, Jr., Camden, N. J., for appellant.

Bonnie Brigance Leadbetter, Asst. Dist. Atty., Philadelphia, Pa., for appellee.

Before ADAMS, ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal from a denial of a writ of habeas corpus presents the question whether the constitutional command against exposing one to double jeopardy precludes the Commonwealth of Pennsylvania from again trying Keith Webb on the same charges emanating from a robbery. At either one or both of two previous trials on those charges, Webb asserts, the trial judges prematurely or improperly determined that the juries were unable to reach unanimous verdicts and declared mistrials, thereby depriving Webb of his constitutional right to secure a verdict from those specific juries.

### I.

A brief summary of the facts will provide sufficient background for the issue presently before the Court.

At approximately 11:00 P.M. on Sunday, November 26, 1972, several persons robbed a rectory and three clergymen who resided therein. Webb was charged with having participated in the robbery. His first trial on the allegations involving that incident began before a jury in the Court of Common Pleas in Philadelphia County on May 23, 1973. The presentation of the case continued until noon on June 3, 1973, at which time the jury began its deliberations. The jury deliberated for the remainder of the day on June 4th and all day June 5th. At the jurors' request certain testimony was re-read to them on June 5th. The jury recommenced their consideration of the case at 9:00 A.M. on June 6th.

At noon that day the trial judge summoned the jury back to the courtroom. The court asked the jurors whether they were close to a verdict; whether they felt that given additional time they would be able to reach a verdict; and whether they felt themselves hopelessly deadlocked. The judge specifically advised the panelists that his questions were addressed to each of them, and he received from each of them an affirmative indication that they agreed with the foreman's statement that they were not close to a verdict and were hopelessly deadlocked. The trial judge then, over the objection of Webb's counsel, declared a mistrial on the ground of a hung jury.

Webb was brought to trial a second time on the same charges on September 19, 1973, again before a jury in Philadelphia Common Pleas Court. At the second trial Webb was identified as one of the robbers by two of the clergymen who had been in the rectory during the robbery. Webb, on the other hand, presented testimony that he had spent the evening in question eating dinner and watching television until 11:00 P.M. at the apartment of friends. He had then, he claimed, crossed the hall to his own apartment, where he stayed with his wife and children, for the remainder of the night.

The second trial lasted from September 19th to September 25th. On the latter date the trial judge charged the jury,

and that body commenced deliberations at 10:37 A.M. At 2:13 P.M. the panel interrupted its discussions in order to obtain additional instructions and a re-reading of certain testimony. The jury was excused from the courtroom at 2:35 P.M. in order to continue its deliberations.

At 5:43 P.M. the judge on his own initiative, without receiving a request from counsel or from the jury, asked the jury to return to the courtroom. The jury had deliberated for approximately six and one-half hours.[1] The following is the entire colloquy which then took place between the court and the foreman of the jury:

> The Court: Mr. Foreman, is there any hope of arriving at a verdict?
>
> The Foreman: I don't believe so, sir.
>
> The Court: Do you believe that further deliberation might be fruitful?
>
> The Foreman: No, I do not.
>
> The Court: Do you feel that your positions are so adamant that you couldn't possibly arrive at a unanimous verdict? Is that what you're telling me?
>
> The Foreman: Yes, sir, I do believe that.
>
> The Court: All right. I discharge you from further consideration of the case. You may report to the jury room tomorrow morning.

The record does not reflect that the trial judge at any time solicited or received the views of any members of the jury other than the foreman regarding the progress of their deliberations or the prospects for a unanimous verdict within a reasonable time. Webb's counsel promptly objected to the declaration of a mistrial. The court, however, discharged the jury. The entire proceedings from the jury's return to the courtroom to the adjournment of the court, including the noting of defendant's objection and an interchange between the crier and the court regarding future service by the jurors, consumed only seven minutes.

## II.

Following the second mistrial Webb moved to dismiss the indictment on double jeopardy grounds.[2] The court of common pleas denied the motion, but ordered the district attorney "to review the case to make a determination whether its evidence warrants further prosecution, in view of the inability of two prior juries to reach a unanimous verdict."

By the time the district attorney indicated his intention to re-try Webb, the period for requesting a certificate for an interlocutory appeal from the decision of the common pleas court had elapsed.[3] Webb, however, sought a writ of prohibition from the Pennsylvania Supreme Court on the ground of double jeopardy. The writ was denied without an opinion. Webb proceeded to petition the district court for a writ of habeas corpus so as to prevent the Commonwealth from re-trying him on those charges. The district court denied the request, again without an opinion. Webb then appealed to this Court.

It is not an engaging task for a federal court to intrude upon the criminal proceedings of a state court through grants of habeas corpus to persons held in custody by the state. However, where federal constitutional rights are imperiled, there is a federal interest in the case which outweighs our concern—as considerable as that concern may be—for comity with the states.[4] Therefore,

---

1. At oral argument counsel made an uncontroverted representation that lunch was delivered to the jury in the jury room. The record does not indicate whether deliberations were suspended while the jury had its lunch.

2. Webb had also moved for dismissal of the indictment after the first mistrial, but the common pleas court rejected the motion and refused to certify an interlocutory appeal.

3. Pa.Stat.Ann., tit. 17 §§ 211.501, 211.502 (Supp.1974).

4. Fay v. Noia, 372 U.S. 391, 431–32, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

when a state prisoner properly demonstrates to a federal court that the state proceedings have denied him or are about to deny him certain federal constitutional rights, the federal court has the power to grant the writ.

The Commonwealth has not—either in the district court or before this Court—contested that Webb has exhausted his presently available state remedies. Nor has the Commonwealth asserted that it would be premature for the federal courts to adjudicate Webb's double jeopardy claim at this time. However, we address the question here in order to clarify the relationship of this case to our recent decision in Moore v. DeYoung.[5]

In Moore we held that the district court had acted prematurely in granting habeas, prior to the completion of the state criminal proceedings, to a state prisoner who asserted that the State had denied him his constitutional right to a speedy trial. The state trial court in Moore had, on Moore's motion, dismissed the charges, but the appellate division of the superior court reversed with respect to two of the three charges, concluding that in the absence of a showing of actual prejudice to the defendant in the preparation of his case, the indictments should not be dismissed.[6] The trial court then, after a further evidentiary hearing, held there had been an insufficient showing of actual prejudice and refused to dismiss the charges. Moore then requested, but was denied, interlocutory review by the superior court and the state supreme court. Those proceedings, we held, did not constitute exhaustion,

and Moore had not demonstrated "exceptional circumstances" justifying the award of the writ in the absence of exhaustion.

■ Under the circumstances of this case, however, Webb has exhausted the available state remedies. He has done all that could reasonably be expected of him to afford the state courts, before he is subjected to the trauma of an additional trial, "an opportunity to consider on the merits his constitutional claim"[7] that the double jeopardy provision barred his re-trial. There is no state procedure available to him at this time by which he could seek vindication of the right asserted in the district court. In this case, unlike Moore, denial of pretrial habeas relief would effectively deny the petitioner one of the important protections the Constitution arguably grants him. Concededly, if Webb were convicted on re-trial, the state courts might, on appeal, recognize the validity of his double jeopardy claim. However, as more fully discussed below,[8] one of the principal purposes of the double jeopardy clause is to spare the accused the rigors incident to the subsequent trial itself. Thus even if acquitted at the later trial, or if the conviction resulting from that trial were overturned on appeal, the accused would already have been subjected to a great personal strain which, if the additional trial offended the double jeopardy provision, the state may not constitutionally impose on the accused.[9] Because of the nature of the constitutional right Webb asserts, no post-conviction relief, either state or federal, is capable of vindicating that interest.

**5.** 515 F.2d 437 (3d Cir., filed April 8, 1975).

**6.** The appellate division affirmed dismissal of the third charge because the proofs required to establish that charge coincided with those necessary to prove the offense charged in a prior indictment which had been dismissed.

**7.** Braden v. Thirtieth Judicial Circuit Court, 410 U.S. 484, 490, 93 S.Ct. 1123, 1127, 35 L.Ed.2d 443 (1973).

**8.** See text accompanying notes 29–36.

**9.** See United States v. Lansdown, 460 F.2d 164, 171 (4th Cir. 1972). In the context of deciding that the denial of a motion to dismiss an indictment on grounds of former jeopardy is an appealable final order, the court stated: "Even if an appellate court reverses the conviction in a second trial on the grounds of double jeopardy, a defendant has still not been afforded the full protection of the fifth amendment since he has been subjected to the embarrassment, expense, anxiety and insecurity involved in the second trial."

In *Moore,* on the other hand, defendant's right to a speedy trial would vitiate a subsequent conviction only if the prejudice resulting from the pretrial delay outweighed any justification for the delay.[10] Thus Moore's only constitutional right under the circumstances[11] was one which could be fully protected after prejudice had been demonstrated or during post-conviction review in either the state or the federal courts. *Moore* and *Webb* are distinguishable, therefore, on the basis of the nature of the right the habeas petitioner seeks to protect.

In this respect the present · case is more closely analogous to Braden v. Thirtieth Judicial Circuit Court[12] than to *Moore.* In *Braden,* as in *Moore,* the constitutional right asserted was the right to a speedy trial. Braden made repeated demands for a speedy trial on charges pending in the Kentucky courts. No action was taken respecting those demands, however. Braden sought from the state supreme court, and was denied, a writ of mandamus requiring him to be brought to trial promptly. Braden then petitioned in the district court for a writ of habeas corpus compelling the state courts to afford him a trial without further delay. Thus the right asserted by Braden—the right to a trial at that time —was, like that now asserted by Webb, one which could not be adequately protected by post-conviction appellate review, since further delay would prolong the period during which the accused would be subjected to the "anxiety and concern accompanying public accusation."[13] "Under these circumstances," the court concluded, Braden had exhausted his state remedies. Because delaying consideration of Webb's constitu-

tional claim until after conviction in the state court would, as in *Braden,* deprive the accused of the very right he seeks to protect, and no state procedure is currently available to protect that right, we conclude, as did the Supreme Court in *Braden,* that under these circumstances Webb has exhausted his state remedies.

The situation presently before us also differs from that in *Moore* since adjudication of Moore's speedy trial claim required a determination of facts not then available to the district court. As previously noted, pretrial delay invalidates a conviction only upon a balancing of such factors as the length of. and reason for delay, the presence or absence of a demand by the defendant for a speedy trial, and the prejudice to the defendant resulting from the delay. The importance of each of these factors in an individual case frequently may not be determinable until after trial. Indeed, the prejudice to the defendant from the delay may be so minimal that it will not affect the outcome of the case at all.[14] By contrast, the determination of the double jeopardy claim asserted by Webb here will not be aided by any facts subsequently developed at trial. The question whether the juries were properly discharged at Webb's previous trials must be decided on the basis of the situation which existed at the time the trial judges declared the mistrials.

■ We are mindful of the Supreme Court's admonition that, even where the petitioner has properly requested and has been denied all available state pretrial remedies, "federal habeas corpus does not lie, absent 'special circumstances,' to adjudicate the merits of an

---

10. *See* Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

11. If the state had, in *Moore,* still been seeking to delay the trial, habeas might have been available to compel a trial at an early date. *See* Braden v. Thirtieth Judicial Circuit Court, 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973).

12. 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973).

13. Klopfer v. North Carolina, 386 U.S. 213, 222, 87 S.Ct. 988, 993, 18 L.Ed.2d 1 (1967).

14. In *Barker,* 407 U.S. at 519–22, 92 S.Ct. 2182, the Supreme Court noted that, because of the peculiar nature of the right to a speedy trial, although deprivation of the right may impermissibly subject the accused to an excessively prolonged period of anxiety, such deprivation also may work to the advantage of the accused.

affirmative defense to a state criminal charge prior to a judgment of conviction by a state court." [15] In the present case,[16] however, "special circumstances" exist because forcing Webb to trial would defeat the constitutional right Webb seeks to preserve, and because Webb has already been compelled to twice undergo the rigors of a trial devoted to these charges.[17]

Accordingly, we must proceed to determine the merits of Webb's petition for habeas relief.[18]

### III.

The Fifth Amendment's proscription against twice putting a defendant in jeopardy for the same offense [19] was originally applicable only against the federal government, but more recently has been held to be enforceable against the states through the Fourteenth Amendment.[20] The Fifth Amendment precludes both multiple punishments and multiple prosecutions for the same offense.[21] Jeopardy attaches, in a jury trial, when the jury has been impaneled and sworn.[22]

"The double-jeopardy provision of the Fifth Amendment, however, does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to

15. *Braden,* 410 U.S. at 489, 93 S.Ct. at 1127.

16. We need not decide here whether a double jeopardy claim per se presents "special circumstances" justifying a pretrial grant of habeas. *But see* United States ex rel. Russo v. Superior Court, 483 F.2d 7, 12 (3d Cir.), cert. denied 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973).

17. This Court has already ruled that a district court has jurisdiction to grant habeas relief to a petitioner, like Webb, free on bail pending retrial in a state court, even though the petitioner has not yet been convicted. United States ex rel. Russo v. Superior Court, 483 F.2d 7, 12 (3d Cir. 1973).

18. Since the present case, unlike *Moore,* does not involve even tangentially an injunction against a pending state criminal proceeding, the restraints on the equitable power of federal courts set out in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny are not directly applicable. Similar considerations of comity and the necessity of respect for coordinate judicial systems, however, underlie the reluctance of federal courts to enjoin pending state criminal proceedings and the requirement that state habeas petitioners first exhaust the available state remedies. *Cf.* Schlesinger v. Councilman, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975). *Younger* directs that federal courts not enjoin pending state prosecutions in the absence of a showing of bad faith, harassment or other "extraordinary circumstances" in which the necessary irreparable injury can be shown. Although we do not suggest that grounds for granting habeas before trial and for enjoining state prosecutions are identical, we note in passing that prosecution of Webb on these charges would result in irreparable injury to his constitutional liberties. As we observed above, because of

the nature of the right asserted, the threat to Webb's rights presented by the impending prosecution is not one which could "be eliminated by his defense against a single criminal prosecution." Younger v. Harris, 401 U.S. at 46, 91 S.Ct. at 751. *Compare* Helfant v. Kugler, 500 F.2d 1188, 1200–04 (dissenting opinion) (3d Cir.), vacated 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1974). Further, if Webb's allegations are correct, the harm is clear and imminent; it would occur immediately upon the commencement of an additional trial. *Compare Helfant,* 500 F.2d at 1201–02 (dissenting opinion).

Moreover, a grant of habeas in the present case would be less disruptive of state-federal relations than a *Younger*-type injunction. These habeas proceedings ascribe to the state judiciary no partiality, incompetence or intent to harass. Nor have the federal courts precluded the state courts from an opportunity to find the facts or interpret the law. *Cf.* Schlesinger v. Councilman, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975). The federal courts are not here intervening in the middle of a state proceeding, but only after the completion of two prior trials. Finally, a grant of habeas would not here delay a state proceeding thereby prejudicing the chances for its ultimate success.

19. U.S.Const. Amend. V provides in part: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb."

20. Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

21. North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); United States v. Wilson, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975).

22. United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).

end in a final judgment." [23] Rather, as stated in the seminal case of United States v. Perez, the state may constitutionally re-try the defendant on identical charges, provided that "taking all the circumstances into consideration, there is a manifest necessity for the [discharge of the jury] or the ends of public justice would otherwise be defeated." [24] In Perez the Supreme Court held that the genuine inability of the jury to reach a unanimous verdict within a reasonable period constitutes "manifest necessity" for discharge of the jury and retrial of the accused.

Dismissal of a jury over the objection of the accused, however, before they have delivered a verdict treads upon the central purposes of the prohibition on double jeopardy. In declaring a mistrial over the defendant's objection on the ground of a hung jury, the trial judge deprives the accused of the "valued right to have his trial completed by a particular tribunal," [25] one which "he might believe to be favorably disposed to his fate." [26] The double jeopardy provision was intended to preclude the defendant from being subjected to multiple prosecutions and the consequent increased risk of conviction.[27]

■ An additional purpose of the prohibition on multiple prosecutions for a single offense was to limit the expense and trauma imposed on the accused. As the Supreme Court stated in Green v. United States: [28]

The State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

Justice Harlan reiterated this latter concern more recently in United States v. Jorn: [29]

A power in government to subject the individual to repeated prosecutions for the same offense would cut deeply into the framework of procedural protections which the Constitution establishes for the conduct of a criminal trial. And society's awareness of the heavy personal strain which a criminal trial represents for the individual defendant is manifested in the willingness to limit the Government to a single criminal proceeding to vindicate its very vital interest in enforcement of criminal laws.

The trilogy of the Supreme Court's most current cases involving double jeopardy,[30] all decided after the adjudication of this case by the district court, again emphasizes that the Fifth Amendment is intended to limit the number of times the government may force an individual to undergo the emotional strain incident to a criminal trial. In each case the majority opinion quotes the above-cited passage from Green.[31] Moreover, the

23. Wade v. Hunter, 336 U.S. 684, 688–89, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).

24. 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824).

25. Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).

26. United States v. Jorn, 400 U.S. 470, 484, 486, 91 S.Ct. 547, 558, 27 L.Ed.2d 543 (1970). See United States ex rel. Russo v. Superior Court, 483 F.2d 7, 12 (3d Cir. 1973), cert. denied 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973).

27. Green v. United States, 355 U.S. 184, 187, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); Russo, 483 F.2d at 12.

28. 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957).

29. United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1969).

30. United States v. Wilson, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975); United States v. Jenkins, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975); Serfass v. United States, 420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975).

31. 420 U.S. at 343, 370, 388, 95 S.Ct. 1013, 1006, 1055.

resolution of the double jeopardy issues was determined in each instance by whether the defendant had already once been subjected to the travail of a trial "devoted to the resolution of factual issues going to the elements of the offense charged"[32] and whether, in the event of a successful appeal by the government, further proceedings would be required.

In *Wilson* the jury had found the defendant guilty, but, on a post-trial motion the district court dismissed the indictment on the basis of unreasonable and prejudicial pre-indictment delay. The Supreme Court ruled that since the appellate courts could decide the issue of delay without subjecting Wilson to a second trial, double jeopardy did not bar an appeal by the government.[33] "[A] defendant," the Court stated, "has no legitimate claim [under the double jeopardy clause] to benefit from an error of law when that error could be corrected without subjecting him to a second trial before a second trier of fact."[34] On the other hand, in *Jenkins* the Fifth Amendment barred an appeal by the government since a resolution of that appeal in the government's favor would have subjected Jenkins to additional proceedings relating to a factual determination of guilt or innocence.

The Court held that the government was not precluded from appealing in *Serfass*. Although a successful appeal by the prosecution would compel Serfass to undergo the strain incident to a trial, he had never before been " 'subjected to the hazards of trial and possible conviction.' "[35]

Thus the most recent Supreme Court interpretations of the Fifth Amendment attest that at the core of the double jeopardy clause is a shield for the accused preventing the government from repeatedly inflicting upon him the burden of a trial. In the present case Webb has already been subjected to the strain of such an experience not once, but twice. Before the Commonwealth may try Webb again, therefore, we must determine that the trial courts have acted circumspectly in terminating his two prior trials before they culminated in a verdict.

Although, as Judge Weis points out in his dissent, trial judges have significant discretion in deciding to discharge juries which appear to have become hopelessly deadlocked,[36] the precise question here is whether the trial judge has transgressed the limitations which the Supreme Court has set down for the exercise of that discretion. The Supreme Court cases, especially the more recent ones, reveal that the Court has confined the proper exercise of such discretion to severely limited situations. Early in the history of the Fifth Amendment Mr. Justice Story declared in United States v. Perez that if the accused is to be reprosecuted, the trial court must exercise a "*sound* discretion" in discharging a jury which has not reached a verdict. "To be sure," he said, "the power [to dismiss the jury] ought to be used with the *greatest caution*, under *urgent* circumstances, and for *very plain* and *obvious* causes."[37] On a subsequent occasion the Court made even more explicit the limited nature of a trial court's discretion in this regard: "The discretion to discharge the jury before it has reached a verdict is to be exercised 'only in *very extraordinary* and *striking* circumstances,' . . ." In the latter opinion the Court characterized the cases in which the jury may be dismissed without insulating the defendant from further prosecution as those "when there is an *imperious necessity* to do so."[38]

**32.** 420 U.S. at 370, 95 S.Ct. at 1013.

**33.** 420 U.S. at 365, 95 S.Ct. 1013.

**34.** 420 U.S. at 345, 95 S.Ct. at 1023.

**35.** 420 U.S. at 391, 95 S.Ct. at 1064.

**36.** *See* Illinois v. Somerville, 410 U.S. 458, 462, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); Gori v.

United States, 367 U.S. 364, 368, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961); Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed.2d 974 (1949); United States v. See, 505 F.2d 845, 850 (9th Cir. 1974).

**37.** 22 U.S. (9 Wheat.) 479, 6 L.Ed. 165 (1824).

**38.** Downum v. United States, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963) (emphasis added).

In its most recent opinion dealing with the termination of a jury trial prior to the return of a verdict the Supreme Court acknowledged that historically the language of the courts has often indicated that discretion may be reserved to the trial courts, but the Court then proceeded to define the narrow limits within which that discretion may be exercised:

> In reviewing the propriety of the trial judge's exercise of his discretion, this Court, following the counsel of Mr. Justice Story [in *Perez*] has *scrutinized* the action [of discharging the jury] to determine whether, in the context of that particular trial, the declaration of a mistrial was dictated by "manifest necessity" as "the ends of public justice." [39]

Like the above-cited expressions by the Supreme Court regarding the import of the double jeopardy provision, the Court's decisions have on their facts allowed trial courts only a circumscribed discretion in declaring mistrials. Reprosecution has been permitted solely in those instances where the Supreme Court has concluded for itself that the circumstances presented a "manifest necessity." In making that determination the Court has regarded "the policy of avoiding multiple trials" as "so important that exceptions to the principle have been only *grudgingly* allowed." [40] Thus the Court has concluded that re-prosecution was permissible where the previous trial was aborted because military necessity required dispersal of the members of the tribunal [41] or where a non-waivable defect in the indictment which was not discovered until after the commencement of the trial precluded the state from retaining its verdict if its evidence persuaded the jury. [42] The Court has held, however, that although grants of continuances may have been within the discretion of the trial court, the Fifth Amendment barred retrial after the jury had been dismissed because of the absence of a prosecution witness whose testimony was crucial on only two of six counts,[43] or where [44] the trial court ordered a mistrial because it concluded, in spite of assurances to the contrary by the prosecutor and the first witness, that the prosecution witnesses needed an opportunity to consult their attorneys.[45]

■ Because of the constitutional policy against terminating a trial before the defendant has had an opportunity to be acquitted by a jury, a trial judge must exercise extreme caution before declaring a mistrial.

In *Jorn*, Justice Harlan, in a plurality opinion for four members of the Court, stated: [46]

> In the absence of such a motion [for a mistrial by the defendant], the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option [to go to the jury] until a *scrupulous* exercise

**39.** Illinois v. Somerville, 410 U.S. 458, 462–63, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973) (emphasis added).

**40.** United States v. Wilson, 420 U.S. 332, 343, 95 S.Ct. 1013, 1022, 43 L.Ed.2d 232 (1975).

**41.** Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed.2d 974 (1949).

**42.** Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).

**43.** Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963).

**44.** United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).

**45.** The limited extent of the discretion which the Third Circuit has afforded to trial courts is indicated by our conclusion in *Russo*, that the question whether "manifest necessity" existed in the situation presented by that particular case is a question which "we can freely review," and that "trial judges may declare a mistrial without barring reprosecution only in extraordinary circumstances." 483 F.2d at 13, 15.

**46.** Two members of the Court believed the Court was statutorily denied jurisdiction, but "in view of a decision by a majority of the Court to reach the merits, they join[ed] the judgment of the Court." 400 U.S. at 488, 91 S.Ct. at 558.

of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings.[47]

Thus, before dismissing a jury over the defendant's objection the trial judge must "take care to assure himself that the situation warrants action on his part foreclosing the defendant from a potentially favorable judgment." [48] Such action "is not one to be lightly undertaken, since the interest of the defendant in having his fate determined by the jury first impaneled is itself a weighty one." [49] In a close case, any doubts are to be resolved in favor of barring retrial.[50]

## IV.

Questions regarding retrial after the discharge of a jury without a verdict are not to be decided by a rigid application of mechanical formulae.[51] Upon consideration of all the circumstances in the present case, the record does not establish that before dismissing the jury the judge at Webb's second trial exercised the "scrupulous" and "extraordinary" care that the Supreme Court has mandated for the protection of a defendant's constitutional right to be spared repeated attempts to convict him. The record is inadequate to establish that the situation presented those "extraordinary circumstances" which the Supreme Court, as well as this Court, has repeatedly held will alone justify retrial following dismissal of the jury before the return of a verdict.

The trial judge raised the issue of jury deadlock *sua sponte.* Webb had not asked that a mistrial be declared nor had he consented to the jury's discharge.[52] Indeed, the record does not show that the trial judge consulted with or informed either counsel prior to dismissing the jury. Nor has the prosecution suggested that he did so.

There is no indication, in the trial record or elsewhere, that prior to the court's summoning the jury back into the courtroom, the panel had ever intimated to the judge that they would be unable to agree upon a verdict. Thus the impetus for a mistrial was provided solely by the judge rather than by the jurors.[53]

In addition, the trial judge directed his interrogatories solely to the jury foreman, and so far as the record reveals,[54] the foreman, alone, indicated a response. The other members of the panel were in the box at this time, and it would concededly have been possible for another juror who disagreed with the foreman's assessment of the jury's status to make

---

47. 400 U.S. at 485, 91 S.Ct. at 557 (emphasis added).

48. *Jorn,* 400 U.S. at 486, 91 S.Ct. at 557.

49. *Somerville,* 410 U.S. at 471, 93 S.Ct. at 1073.

50. *Downum,* 372 U.S. at 738, 83 S.Ct. 1033; United States ex rel. Russo v. Superior Court, 483 F.2d 7, 17 (3d Cir. 1973).

51. Serfass v. United States, 420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975); Illinois v. Somerville, 410 U.S. 458, 463, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).

52. Contrast this important factor with the situation in United States v. Brahm, 459 F.2d 546, 550 (3d Cir. 1972); United States v. Phillips, 431 F.2d 949, 950 (3d Cir. 1970); United States v. Goldstein, 479 F.2d 1061 (2d Cir. 1973); Forsberg v. United States, 351 F.2d 242 (7th Cir. 1965). *See* United States v. Jorn, 400 U.S. 470, 485, 91 S.Ct. 547, 27 L.Ed.2d 543 (1970).

53. Contrast the situation here, in this regard, with that in United States v. Brahm, 459 F.2d 546 (3d Cir. 1972), affirming United States v. Medina, 323 F.Supp. 1277 (E.D.Pa.1971); United States v. See, 505 F.2d 845 (9th Cir. 1974); United States v. Goldstein, 479 F.2d 1061 (2d Cir. 1973); Marienfeld v. United States, 214 F.2d 632 (8th Cir. 1954).

54. In this respect the record of the second trial may be contrasted with that of the first, where the trial judge addressed the other members of the panel and the reporter recorded the responses of each, which took the form of an affirmative nod of the head. The record demonstrates that the judge in the first trial made a scrupulous effort to ensure that he observed each juror's reply.

his opinion known to the court. However, unanimous consent cannot be inferred from a silent record. It may be, as Judge Weis asserts, that many citizens if placed on this jury would have voiced any disagreement they may have had with the opinion expressed by the foreman. There has been no empirical showing, however, that all jurors are so self-assertive. It is at least possible that one or more of the jurors here stood sufficiently in awe of the authority of the court or were sufficiently swayed by the court's demand for orderly proceedings that they were deterred from making unsolicited comments on the jury's progress.[55] In any event there is no clear showing that the foreman's responses here necessarily represented the unanimous opinion of the jury, or even that of a majority of the panel.[56] The record, therefore, especially with regard to an adjudication affecting constitutional rights, does not furnish an adequate

showing that it was the collective sentiment of the jury that they had reached an impasse.[57]

There is no uniform minimum period during which a jury must deliberate before the court may declare a hung jury. Instead, the decision to discharge the jury must take into account all the circumstances.[58] It is also true, as Judge Weis points out, that juries frequently reach a deadlock within the period of time during which the trial judge here permitted the deliberations to continue.[59] In the present case, however, the absence of a unanimous verdict after approximately six and one-half hours of deliberations is not irreconcilable with the jury's ability to arrive at a unanimous verdict within a reasonable time. Although the principal contested issue was not complex conceptually, it could well have been an onerous one to resolve—involving as it did the credibility

**55.** *But cf.* United States v. Lansdown, 460 F.2d 164, 167 (4th Cir. 1972), where a juror spontaneously requested ten more minutes to deliberate.

**56.** If the jury had, on its own initiative, declared itself deadlocked, there might have been less necessity for the judge to have inquired into the opinions of the other jurors since, in such situation, the jury would presumably have reached a consensus before reporting its deadlock to the judge. *Cf.* United States v. See, 505 F.2d 845, 851 (9th Cir. 1974).

**57.** Although there is certainly no indication in this case, nor even a suggestion, of an attempt by the trial court to thwart an acquittal by a jury he believed likely to return a verdict in favor of Webb, in *Russo* this Court cautioned that in deciding whether double jeopardy bars a subsequent proceeding after a mistrial, a court should consider the extent to which the procedure followed in dismissing the prior jury is open to manipulation. 483 F.2d at 14, 16: *See Somerville,* 410 U.S. at 464, 469, 93 S.Ct. 1066; *Green,* 355 U.S. at 188, 78 S.Ct. 221; *Downum,* 372 U.S. at 736, 83 S.Ct. 1033.

In spite of the absence of any hint of manipulation in this particular case, out of a solicitude for the protection of the constitutional rights of criminal defendants to avoid multiple trials except in instances of manifest necessity, we must observe that "[t]he manner in which the decision in this case was reached could

easily lead to manipulation." *Russo,* 483 F.2d at 16. As noted above, the trial judge, not the jury itself, was the first to raise the spectre of deadlock. The court did not ask the full panel to consider the prospects for agreement. Also, the trial judge's queries to the foreman appear to have been leading in character, particularly in a situation where the jurors had not previously indicated that they could not reach a verdict. Thus the procedure utilized by the trial judge here to determine whether there was a hung jury is open to abuse. If retrial were permitted in such situations, trial judges would be able to afford the prosecution a more favorable opportunity to convict by terminating a jury's ongoing deliberations and eliciting from one member of the jury, through suggestive questioning, an indication that the jury might be unable to agree. Such manipulation "allowing the prosecutor to seek to persuade a second trier of fact of the defendant's guilt after having failed with the first" is antithetical to the purposes of the double jeopardy clause. *Wilson,* 420 U.S. at 352, 95 S.Ct. 1013; *Green,* 355 U.S. at 188, 78 S.Ct. 221; *Downum,* 372 U.S. at 736, 83 S.Ct. 1033.

**58.** *See* United States v. Lansdown, 460 F.2d 164, 169 (4th Cir. 1972).

**59.** *See* Kalven & Zeisel, The American Jury 458–59 (1966).

of the witnesses on each side weighed against the witnesses' respective opportunities to observe and remember.

Conscientious jurors might well consider that a proper resolution of the issue required the panel to reflect on the content of each witness' testimony to determine whether there were any flaws or inconsistencies indicative of faulty memories or fabrication, as well as to ponder the quality of each witness' identification testimony. Resolution of these issues could have been complicated further by the provocative, sensational nature of the case. Therefore, the lack of a verdict within the period of deliberation permitted by the trial court does not in the circumstances here justify the declaration of a mistrial.

A final factor supporting the prohibition of further proceedings against Webb with regard to the accusations here is the earlier discharge of the jury at the first trial. Thus the Commonwealth has already twice subjected Webb to "the heavy personal strain which a criminal trial represents for the individual defendant."[60] The existence of the prior proceedings, which were known to the second court, mandated the exercise of even greater caution before depriving Webb of the opportunity "of being able, once and for all, to conclude his confrontation with society through the verdict" of the jury then sitting.[61]

Since the record here does not contain a sufficient basis for the discharge of the jurors at Webb's second trial, and does not reflect that "scrupulous exercise of judicial discretion lead[ing] to the conclusion that the ends of public justice would not be served by a continuation of the proceedings" which has been commanded by the Supreme Court, the double jeopardy clause bars the Commonwealth from again endeavoring to convict Webb on the accusations of complicity in the robbery of the rectory. Accordingly, the judgment of the district court will be reversed.

WEIS, Circuit Judge (dissenting):

Since the decision in United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), it has been accepted without question that the failure of a jury to agree upon a verdict is a circumstance which does not bar a retrial. We need not, therefore, be concerned with what, in other cases, might be extraordinary circumstances justifying a mistrial.

The question here is narrow—was the trial judge justified in concluding that the jury would be unable to reach a verdict? An appellate court's scope of review is restricted to determining only if the trial court abused its discretion. United States v. Goldstein, 479 F.2d 1061 (2d Cir. 1973); United States v. Brahm, 459 F.2d 546 (3d Cir. 1972).

Justice Story's opinion in United States v. Perez, *supra,* while addressed to the subject of mistrials generally, did set out the guidelines for trial judges to follow in deciding whether a jury is deadlocked.

"They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and in capital cases especially, the court should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound and conscientious exercise of this discretion, rest, in this, as in other cases, upon the responsibility of the judges, under their oaths of offices." 22 U.S. at 579, 6 L.Ed. 165.

More recent cases discussing the broad problem of terminating a criminal trial before verdict have reaffirmed the discretion granted to trial judges. In Illi-

---

**60.** Jorn, *400 U.S. at 479, 91 S.Ct. at 554.*

**61.** *Jorn,* 400 U.S. at 486, 91 S.Ct. 547.

nois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), reference was made to the "broad discretion" reserved to the trial judge. Citing Gori v. United States, 367 U.S. 364, 368, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1960), the Supreme Court said:

> "Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing with the trial, a mistrial may be declared . . . ." 410 U.S. at 462, 93 S.Ct. at 1069.

In addressing the specific problem of a deadlocked jury, the ABA Standards on Criminal Justice, Trial by Jury § 5.4(c) states that the jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement. The commentary suggests that, in exercising his discretion, the trial judge may question the jurors and may weigh such considerations as the length of the deliberation, the length of the trial, and the nature and complexity of the case. *See also* United States v. See, 505 F.2d 845 (9th Cir. 1974); United States v. Goldstein, *supra*. The court must be careful also that it not force the jurors to continue deliberations if, as a result, the verdict becomes a product of coercion and exhaustion rather than reasoned judgment.[1]

The majority correctly states that no rigid application of mechanical formulae is proper to decide the case. However, we must review the record, cold and lifeless as it is, to see if it furnishes any help to us. No transcript can adequately convey all the nuances of the trial: how the evidence was presented, the atmosphere engendered by the adversary proceeding, and the visceral reaction of an experienced trial judge as he weighs the alternatives of further jury deliberation or the declaration of a mistrial. Despite this difficulty, however, my review of the record convinces me that there was no abuse of discretion.

The judge who presided over the second trial—the one which is really at issue here—specifically asked the foreman in open court and in the presence of all the jurors if there was any hope of arriving at a verdict and whether further deliberations would be fruitful. The replies were in the negative. Finally, the judge asked, "Do you believe that your positions are so adamant that you couldn't possibly arrive at a unanimous verdict? Is that what you are telling me?" The foreman answered, "Yes Sir, I do believe that."

We do not have the opportunity to see how the individual jurors reacted to those questions, but we may assume that there was no demonstrated disagreement with the foreman's answers. Had there been, counsel for the defendant could have so indicated on the record. The experience of most trial judges is that jurors will correct a statement made by their spokesman which is contrary to their understanding. A poll would have made the record more complete, but I am unwilling to say that a failure to follow that procedure is a reversible omission.[2] Moreover, I do not feel that the inquiry was suspect because it was initiated by the judge rather than by a communication from the jury.[3]

1. This requirement, of course, is equally for the benefit of the defendant and the prosecution.

2. After the jury was discharged, defense counsel noted his objection. While not required, it would be better practice for the judge to consult with counsel before finally deciding to order a mistrial. While the defense lawyer understandably may object after the fact when there is nothing to lose by doing so, the response may be different if the option of continued deliberation is still available.

3. United States ex rel. Russo v. Superior Court, 483 F.2d 7 (3d Cir. 1973), is distinguishable from the case *sub judice* in several significant respects. It did not involve a deadlock and there was an indication that the jury might reach a verdict. Nevertheless, a mistrial was declared *sua sponte* for the cited reason of jury exhaustion although no juror had complained and there was no record to support that conclusion.

The time spent in jury deliberation in this case does not reflect adversely upon the judge's exercise of discretion. The trial began with a selection of a jury which took most of the court day on Wednesday, September 19, 1973, and continued with testimony through Thursday, Friday, and the following Monday, when the closing arguments were made. The judge's charge took place on Tuesday morning, and the jury received the case at 10:37 A.M. The total time for presentation of the case was thus somewhat less than four days. The mistrial was declared on Tuesday evening at 5:50 P.M. The jury had waited in the courtroom for about 25 minutes for the answer to a question during the afternoon, and after making a deduction for that interval, the time spent in deliberation amounted to slightly less than 7 hours.

An authoritative work by Kalven and Zeisel, The American Jury (1966), reveals a correlation between the length of the trial and the time in which the jury may be expected to return a verdict or become deadlocked. The studies indicated that, on the average, cases in which the trial lasted 3 to 5 days produced verdicts in 3.7 hours. By contrast, trials of that length resulted in hung juries in 15 percent of the cases by the fourth hour of deliberation, and an additional 50 percent in the fifth to tenth hour.[4] This empirical datum is not conclusive but does show that the time allotted for deliberation in the case under scrutiny is not inconsistent with determinations of hung juries in other cases.

The fact that the jury had been unable to agree after the first trial is an indication that this case, while not complex, was a close one and, hence, more apt to result in a deadlock. *See* The American Jury, *supra,* at 457. The principal problem was one of identification of the defendant, an area where viewpoints may solidify in a comparative short time and where extended deliberation may prove of little value in resolving conflicting positions.

To justify a reversal, the record must demonstrate that the trial judge abused his discretion.[5] I do not believe that the petitioner has met that burden. No one can ever be certain that the jury would ultimately have reached agreement. The trial judge, the man on the scene, thought that there would be no verdict, and there is enough in the record to support his view. I will not substitute my judgment for his, based as it was on more knowledge of the circumstances than I will ever have.

I would affirm.

---

4. The American Jury, *supra,* at 458, 459. I make no attempt to canvass elapsed time in reported cases because the variables in individual trials play so large a part. *See,* however, the sampling in United States v. See, *supra.*

5. Although I question the wisdom of the prosecution in ordering a third trial, that does not justify a finding of a constitutional infirmity in the declaration of a mistrial.