406 A.2d 799

**COMMONWEALTH of Pennsylvania**

v.

**Edward T. KIVLIN, III, Appellant.**

Superior Court of Pennsylvania.

Argued May 7, 1979.

Decided June 22, 1979.

Reargument Denied Oct. 26, 1979.

Petition for Allowance of Appeal Denied Jan. 1, 1980.

Malcolm W. Berkowitz, Philadelphia, for appellant.

D. Michael Emuryan, Deputy District Attorney, Media, for Commonwealth, appellee.

Before CERCONE, President Judge, and ROBERTS and LIPEZ, JJ.*

ROBERTS, Judge:

Appellant, Edward T. Kivlin, III, was charged with shooting to death Ann Mauro a six year old girl, during an exchange of gunfire with Ann's father at the Mauro residence. On August 11, 1976, a jury convicted him of murder of the third degree and crimes with firearms. After denying post-verdict motions, the trial court sentenced appellant to a term of imprisonment of 10 to 20 years on the murder charge, a concurrent term of 2½ to 5 years on the weapons charge and payment of costs. Appellant raises approximately 75 claims of error. We have examined each, find all without merit and affirm. Only three issues warrant discussion.

## I

■ Appellant asserts that he was subject to double jeopardy in violation of the Sixth Amendment of the Constitution of the United States when he was tried twice on

* Justice SAMUEL J. ROBERTS of the Supreme Court of Pennsylvania and Judge ABRAHAM H. LIPEZ of the Court of Common Pleas of Clinton County, Pennsylvania, are sitting by designation.

charges arising out of the killing of Ann Mauro. Appellant was tried first in May, 1976. The trial court declared a mistrial when the jury failed to reach a verdict after three days of deliberation. Before his second trial in July and August, 1976, appellant filed a motion, alleging double jeopardy and requesting discharge of the indictments against him. The court denied the motion.[1] We find no abuse of discretion.

The jury began its deliberations at about 5:00 p. m., Tuesday, May 25, continued until about 9:00 p. m. that night, resumed deliberations on Wednesday and Thursday and still had not reached a verdict on Friday afternoon, May 28. At about 3:00 p. m. that afternoon, the trial court called the jury into the courtroom:

"THE COURT: Mr. Foreman, the jury has been deliberating since about five o'clock on Tuesday afternoon. It is now three o'clock on Friday.

1. Appellant did not object to the court's declaration of a mistrial. Nonetheless, his assertion of double jeopardy is preserved for appellate review. Even when an accused does not object to discharge of the jury, or objects without specifically raising double jeopardy, a claim that the mistrial was not manifestly necessary is preserved if raised before the subsequent trial. Compare *Commonwealth v. Bartolomucci*, 468 Pa. 338, 362 A.2d 234 (1976) (when raised at retrial, issue preserved although accused did not make specific objection at first trial) with *Commonwealth v. White*, 476 Pa. 350, 382 A.2d 1205 (1978) (double jeopardy claim not preserved when accused failed to raise it at second trial).

Similarly, appellant did not appeal directly to the Supreme Court following denial of his motion to dismiss the indictments before the second trial. An order denying a motion to quash indictments on double jeopardy grounds is immediately appealable. *Commonwealth v. Washington*, 481 Pa. 474, 393 A.2d 3 (1978). The Supreme Court, however, has not indicated that an accused must appeal immediately from that order to preserve his claim. Moreover, the right of immediate appeal was not established until *Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977), subsequent to appellant's second trial. Appellant raised his double jeopardy claim at the earliest possible time permitted by the rules of procedure then existing. His claim, therefore, is properly preserved for review. *Commonwealth v. Cheeks*, 429 Pa. 89, 239 A.2d 793 (1968) (failure to assert right at trial did not waive right announced subsequent to trial). Cf. *Commonwealth v. Ray*, 483 Pa. 377, 396 A.2d 1218 (1979) (counsel not ineffective for failing to advance theory recognized by Supreme Court only subsequently).

I want to know, if you deliberate any longer do you think you can arrive at a verdict?

THE FOREMAN: No, Your Honor.

THE COURT: Does anyone in the jury disagree with that?

(Responses of the Jury were 'No' or nodding of heads.)

THE COURT: Members of the Jury, under these circumstances we consider that you are a hung jury and we declare this trial ended."

■ A defendant may be tried twice without violation of his right not to be placed twice in jeopardy if his first trial concluded without a verdict for reasons of "manifest necessity." *Commonwealth v. White,* 476 Pa. 350, 382 A.2d 1205 (1978). Manifest necessity for retrial exists when there is no reasonable probability that the jury will agree upon a verdict. *Id.* This determination depends on the number, complexity and gravity of the charges and the volume of evidence presented, and rests largely in the discretion of the trial court. *Commonwealth v. Monte,* 459 Pa. 495, 329 A.2d 836 (1974).

■ Although the charges against appellant were not particularly complicated, presentation of the evidence lasted three weeks. It was therefore proper for the trial court to afford the jurors ample time to deliberate. On the other hand, after deliberations so protracted, the court, without waiting for the jurors to report that they were deadlocked, was justified in inquiring whether a verdict could be reached. When the court asked about the possibility of arriving at a verdict, the foreman, without hesitation or equivocation, answered, "No." The court then asked the jurors if they disagreed with the foreman and received a unanimous reply of agreement.

■ Appellant argues that the court should have questioned the jurors to learn their opinions. There is no requirement that the court do so. See, e. g., *Commonwealth v. White,* supra; *Commonwealth v. Monte,* supra. Appellant emphasizes that, because Friday, May 28 was the beginning

of the Memorial Day weekend, the court, in inquiring about and declaring a mistrial, and the jurors, in announcing they were deadlocked, were likely motivated by the desire to avoid further deliberations. This assertion is speculation; the record, from which all reasonable inferences favorable to the Commonwealth must be drawn, e. g., *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976), provides adequate grounds for the court's decision. Similarly, appellant asserts that the "nodding of heads" reflected in the record signalled disagreement with the foreman's statement that a verdict could not be reached. Since the court, upon observing the jurors' reactions to his inquiry, understood the "nodding" to mean "no," and appellant, present with counsel during the colloquy, did not object to this interpretation, the only reasonable inference the record provides is that the jurors were unanimous. Appellant also contends that the court's questioning in itself coerced the jurors into agreeing with the foreman. Again, the record gives no support to this view.

▮ Finally, appellant, listing 21 alleged errors committed at the first trial, argues that he is entitled to discharge because the court and the prosecuting attorney engaged in intentional misconduct designed to induce declaration of a mistrial to afford a more favorable opportunity to convict, or were at least grossly negligent in conducting the trial. See *Commonwealth v. Bolden,* 472 Pa. 602, 373 A.2d 90 (1977). We have examined each asserted error and find no judicial or prosecutorial misconduct justifying discharge. See *Commonwealth v. Hogan,* 482 Pa. 333, 393 A.2d 1133 (1978) (plurality opinion of Roberts, J., joined by O'Brien and Pomeroy, JJ.).

## II

Appellant next argues that the trial court erred in denying his pretrial motion for change of venue. According to appellant, the jurors at his second trial, in July and August, 1976, must have been influenced by the wide publicity during and after his first trial in May, 1976, which, he

asserts, portrayed him as a member of a wicked motorcycle gang, who had killed a young girl and deserved to be found guilty and punished for his crime.

Our Supreme Court recently reviewed the principles governing motions for change of venue. See *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287 (1978). Pretrial publicity will be deemed so inherently prejudicial as to require a change of venue only if the articles appearing were either sensational, inflammatory and slanted towards conviction, rather than factual and objective; revealed that the accused had a criminal record; referred to confessions, admissions or reenactments of the crime by the accused; or derived from reports from the police and prosecuting officers. Even if one of these elements exists, a change of venue is required only if the publicity has been so extensive, sustained and pervasive, without sufficient time between publication and trial for the prejudice to dissipate, that "the community must be deemed to have been saturated with it." *Id.*, 481 Pa. at 153, 392 A.2d at 292–293.

The newspaper, magazine, radio and television reports contained in the record do not meet this standard of inherent prejudice. They were factual and objective, free of any information objectionable under *Casper* and the cases cited therein. Much of the publicity occurred in October and November, 1975, following the incident and appellant's arrest. Even those articles appearing in May, 1976, at the time of the first trial, were two months old by the time of the second. See *Commonwealth v. Casper*, supra (no inherent prejudice where period between publication and trial was 2½ months). We therefore conclude that the publicity was not inherently prejudicial.

The circumstances of the incident, the age of the victim and appellant's membership in a well known motorcycle organization linked to other crimes could have created prejudicial opinions in the minds of prospective jurors. In view of our conclusion that the publicity was not inherently prejudicial, however, appellant must demonstrate actual

prejudice in selection of the jury. *Commonwealth v. Casper,* supra. There is no evidence of actual prejudice.

The trial court conducted an extensive voir dire over a period of five days. One hundred and ten prospective jurors were questioned at length. Ninety two prospective jurors were removed by challenges, for cause or by the court. Of the 25 removed for cause by appellant, only 15 stated that they had formed an opinion on guilt or innocence as a result of newspaper, radio or television reports. The 10 others said that they feared or disliked motorcycle gangs or had very strong feelings in favor of the death penalty. Thus, only a small percentage of the prospective jurors indicated that they held fixed opinions concerning appellant's guilt, and all of them were removed. Every juror at appellant's second trial stated that he had not formed any opinion as to guilt, and appellant does not allege that publicity during the trial tainted an otherwise valid panel. Accordingly, we find that the trial court did not abuse its discretion in refusing appellant's motion for change of venue. See *Commonwealth v. Kichline,* supra; *Commonwealth v. Powell,* 459 Pa. 253, 328 A.2d 507 (1974).

### III

Before trial, appellant submitted a petition requesting permission to exhume the body of the victim to examine it for evidence allegedly proving that he did not fire the bullet causing death. After a hearing, the court denied the motion. Appellant asserts that the court abused its discretion in denying the motion.

Appellant alleged that during the gunfight, he was in a car about 75 feet away from the victim, while her father stood just a few feet from her. By examining the body for traces of particulate matter and residue that would adhere from discharge of a firearm at close range, he sought to prove that Mauro fired the fatal shot. Further, appellant argued that examination of Ann's body would reveal the angle of entry of the bullet into Ann's skull and the size of the bullet, by which he would prove that he did not cause her death.

At the hearing, Dr. Dimitri Constostaulos, a medical examiner from Philadelphia, testified that he had performed an autopsy of the body, in which he found no evidence of firing from close range. Dr. Constostaulos stated that, although he had not performed any examination for residue and particulate matter other than visual observation, he believed that further examination was "extremely unlikely" to reveal evidence of firing from within a few feet. According to Dr. Constostaulos, it was unlikely that any such evidence had ever existed; now, after burial, although further examination, as by neutron activation analysis, "conceivably" could reveal residue, he believed that nothing more could be found. He stated that the bullet causing death was approximately .25 caliber and had entered from the front of the skull, but was not found in the body.

Dr. Walter Hofman, a pathologist, testified for appellant. He admitted that the autopsy report showed no evidence of residue indicating firing from close range, that, if traces of residue remained on the body after washing, embalming and burial, they would be diminished, and that existence of these traces was only speculative. He stated that testing of the body could reveal more accurately the size of the penetrating bullet and that, based on certain assumptions concerning the location of the participants in the gunfight and the position of the gun in each participant's hand, examination of the skull could reveal the source of the fatal bullet by projecting its path from the angle of entry.

Although our Supreme Court has indicated that, in some circumstances, exhumation of the body of the victim in a criminal prosecution is permissible, see *Commonwealth v. Grether*, 204 Pa. 203, 53 A. 753 (1902), it has never set out guidelines for reviewing motions requesting exhumation. Nonetheless, we conclude that the trial court correctly denied appellant's motion.

Existence of the evidence appellant sought was only speculative. Dr. Constostaulos and Dr. Hofman agreed that the autopsy report indicated no sign of firing from close range. They also agreed that further testing after exhumation was

very unlikely to reveal evidence of firing from close range. Accordingly, the court had no factual basis for concluding that exhumation would produce evidence supporting appellant's contention that only Mauro could have fired the bullet that killed Ann. Nor would discovery of the size of the bullet have aided appellant's cause. The autopsy report included a measurement of the size of the bullet based on the size of the wound. At the hearing, appellant offered no evidence indicating that the bullet could not have come from the gun attributed to him. Similarly, calculation of the angle of entry was of only speculative value, since appellant did not present any evidence at the hearing from which the trial court could conclude that he was so stationed that the bullet must have come from another direction.[2]

Admission or exclusion of evidence is a matter within the sound discretion of the trial court. *Commonwealth v. Hart*, 479 Pa. 84, 387 A.2d 845 (1978). Exhumation of the victim's body is to be allowed only under extraordinary circumstances. Where existence of the evidence sought was so speculative and uncertain, and its value in aiding appellant's defense so conjectural and remote, the trial court properly exercised its discretion in refusing appellant's motion. See *Commonwealth v. Grether*, supra (exhumation at request of prosecuting attorney proper where evidence obtained would "conclusively" prove that the defendant fired the fatal bullet); *Taylor v. State*, 260 Ind. 264, 295 N.E.2d 600 (1973), *cert. den.*, 414 U.S. 1012, 94 S.Ct. 377, 38

2. In resting our conclusion, in part, upon appellant's failure to offer supporting evidence, we recognize that the pretrial hearing on his motion could not serve as a forum for extensive presentation of trial evidence. Appellant, however, was obligated to provide the court some basis for concluding that exhumation was vital to his defense. A bona fide offer of evidence he expected to submit at trial might have sufficed, provided, of course, the evidence supported his claim. Since appellant had already been tried once, and his evidence at the second trial corresponded in relevant part to that at the first trial, any evidence favorable to his contentions at the pretrial hearing was available to him at that time. This case, therefore, is not one where evidence in support of a pretrial motion could be developed only subsequently. In these circumstances, appellant must bear the consequences of failing to come forth with an offer of facts in support of his motion.

L.Ed.2d 250 (1973); *State v. Whiteaker,* 499 S.W.2d 412 (Mo.1973), *cert. den.,* 415 U.S. 949, 94 S.Ct. 1472, 39 L.Ed.2d 565 (1974); *State v. Jefferson,* 529 S.W.2d 674 (Tenn.1975).

Evidence presented at trial demonstrates that appellant was not prejudiced by the court's decision. First, the trial confirmed that the evidence appellant sought likely did not exist. Ballistics tests showed that Mauro's gun had jammed after firing one shot, and a bullet hole of the caliber of Mauro's gun was discovered in the car in which appellant and several of his colleagues were sitting at the time of the shooting. Second, the evidence revealed that, even assuming discovery of all information appellant alleged exhumation would produce, appellant's defense would not have been furthered. Mauro, appellant and appellant's colleagues each had held a .25 caliber gun. Discovery of the size of the fatal bullet could not have excluded appellant as the killer. Mauro testified that he fired at appellant while holding his daughter in his arms. Presence of residue on Ann's body would have been consistent with this testimony and would not have identified Mauro as the killer. Finally, the location of the guns held by Mauro, appellant and appellant's colleagues at the time of the shooting was never established so exactly that calculation of the angle of entry would determine the spot from which the bullet was fired. Appellant relies heavily on Mauro's testimony that he was looking right into Ann's eyes when the shooting started; since the bullet entered from the front, appellant argues that this testimony excludes the possibility that he killed Ann. Mauro, however, repeatedly testified only that he was looking at Ann's face just before the shooting. When the firing began, the child might well have turned toward appellant. No evidence contradicts this possibility.

We conclude, therefore, that exclusion of the evidence appellant sought to discover and enter did not prejudice him. Cf. *Commonwealth v. Garland,* 475 Pa. 389, 380 A.2d 777 (1977) (evidence inadmissible as irrelevant which did not contradict Commonwealth's theory of case or lessen likelihood that the defendant committed the crime charged);

*Commonwealth v. Colon,* 461 Pa. 577, 337 A.2d 554 (1975) (plurality opinion) (same), *cert. den.,* 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645 (1976).

Judgments of sentence affirmed.