410 A.2d 1251

**COMMONWEALTH of Pennsylvania**

v.

**Walter STORY, Appellant.**

Superior Court of Pennsylvania.

Submitted April 10, 1978.

Filed Sept. 19, 1979.

Petition for Allowance of Appeal Denied Feb. 25, 1980.

Louis Dadowski, Assistant Public Defender, Pittsburgh, for appellant.

Robert L. Eberhardt, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before JACOBS, President Judge, and HOFFMAN, CER-CONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

**PER CURIAM:**

The six judges who heard this appeal being equally divided, the judgment of sentence is affirmed.

PRICE, J., files an opinion in support of affirmance in which VAN der VOORT and HESTER, JJ., join.

CERCONE, President Judge, files an opinion in support of reversal in which HOFFMAN, J., joins.

SPAETH, J., files an opinion in support of reversal in which HOFFMAN, J., joins.

JACOBS, former President Judge, did not participate in the consideration or decision of this case.

## OPINION IN SUPPORT OF AFFIRMANCE

PRICE, Judge:

Following a jury trial on March 8, 1976, appellant was convicted of robbery,[1] recklessly endangering another person,[2] unlawfully carrying a firearm without a license,[3] and altering marks of identification.[4] Post-trial motions for a new trial and in arrest of judgment were denied, and appellant was sentenced to a term of imprisonment of ten to twenty years on the robbery count, one to two years on the reckless endangerment count, and two and one-half to five years on the count of unlawfully carrying a firearm without a license. The terms of imprisonment were to run consecutively. Sentence was suspended on the count of altering or obliterating marks of identification.

1. 18 Pa.C.S. § 3701.

2. 18 Pa.C.S. § 2705.

3. 18 Pa.C.S. § 6106.

4. 18 Pa.C.S. § 6117.

Appellant now appeals the November 5, 1976 order of the lower court which denied his motions for new trial and in arrest of judgment. He contends that he was placed in jeopardy twice, thereby violating his fifth amendment rights, and the warrantless search of his automobile was not justified by probable cause or exigent circumstances. Appellant also contends that the lower court was in error in admitting into evidence the in-court identification of appellant by the victim of the robbery, Russell Scipio, because the identification lacked a sufficient independent basis to purge the primary taint of an out-of-court one-to-one confrontation between appellant and Mr. Scipio. Finding merit to none of appellant's contentions, we would affirm the order of the court below.

Viewing the evidence in the light most favorable to the Commonwealth, *Commonwealth v. Lee*, 460 Pa. 374, 333 A.2d 773 (1975), the following was adduced at trial. Russell Scipio, an employee of Coca-Cola was delivering soft drinks in the Homewood section of Pittsburgh at approximately 2:00 p. m. on November 1, 1974, when he was accosted by appellant. Mr. Scipio testified that after he loaded his hand truck to make a delivery to one of his clients, he was approached by appellant who was carrying an automatic weapon. Appellant demanded money, and Mr. Scipio gave him what money he had. Appellant then reached into Mr. Scipio's shirt pocket, and Mr. Scipio grabbed appellant's hand, pushed the gun aside, and ran behind the back of his delivery truck. Appellant fired four shots at Mr. Scipio, none of which hit its mark. Appellant then entered a black Cadillac and fled the scene of the crime. Mr. Scipio reported the incident to the police and described appellant as a black male, approximately six feet tall, with an afro hairstyle, and wearing a blue cap, bluejeans and a green coat. Mr. Scipio also reported that although appellant was wearing a blue bandana over his face, he could detect a mustache under it. He also reported that appellant was carrying a .380 automatic weapon which had distinctive file markings on it. Wanda Whitely, a resident of the area, testified that from

her apartment window she observed a black Cadillac cruising the area and that the car had a T.V. antenna on the trunk. After she heard three gunshots, she observed a black man in a coat, which she later identified as appellant's, run to the car and get in on the passenger side. The driver of the car, whom Ms. Whitely also described as a black male, then hastily drove the car from the area. Pittsburgh Police Officers Ronald May and Thomas Rogers, supplied with a description of appellant from Mr. Scipio and a description of the car from Ms. Whitely, stopped a black Cadillac at 2:27 p. m., approximately sixteen blocks from the location of the robbery. The car had a T.V. antenna on the trunk. As the officers approached the car, appellant disembarked. He was wearing light blue colored bluejeans and a purple flowered shirt. He had an afro hairstyle and a full beard. Officer Rogers noticed a blue cap on the front seat of the Cadillac. A black female was seated on the passenger side of the front seat, and two children were seated in the back seat. Appellant presented the police with his owner's card and driver's license. During this time, Officer William Giles arrived to supply back-up assistance. Officer Giles approached the passenger side of the vehicle, and as he opened the door, the female passenger inside kicked her purse, which was under her legs, against the front seat. This action brought Officer Giles' attention to the area under the front seat where he noticed a portion of a green jacket exposed. He reached down and grabbed the jacket, and as he did, he felt a gun [5] contained in one of the jacket pockets. He thereupon pulled the jacket from under the seat. Contained in another jacket pocket was a blue bandana. A search of appellant uncovered $49 in cash.[6] Appellant was arrested and taken to the East Liberty Police Station. There, a barium and antimony test was performed to determine whether appellant had fired a gun within the previous six hours. Test samples

---

5. This gun was later identified as a Walther Model PPK .380 automatic loading pistol. The serial number was removed, and the gun bore distinctive file markings.

6. Mr. Scipio had reported to police that approximately $52 in cash was taken from him during the robbery.

were sent to the Department of Treasury, Bureau of Alcohol, Tobacco and Firearms for analysis. The test results indicated that appellant had fired a gun within six hours of the test, and ballistic tests performed indicated that bullet fragments and cartridge casings found at the scene of the robbery were fired from the gun found in appellant's car.

After appellant's arrest, Mr. Scipio was notified by the police that they had a possible suspect and was asked to come down to the station for identification purposes. When Mr. Scipio first saw him at the police station, appellant was handcuffed and had a green coat draped over his shoulder. Mr. Scipio immediately identified appellant as the man who robbed him earlier that day. The police then put the cap and bandana on appellant and again asked Mr. Scipio whether appellant was the person who robbed him. Mr. Scipio responded affirmatively.

Appellant was indicted by a grand jury on November 13, 1975, and after a suppression hearing on January 18, 1976, the court below, per Judge Robert E. Dauer, granted a motion to suppress the identification of appellant made by Mr. Scipio at the East Liberty Police Station. Appellant's first trial was commenced on January 9, 1976, but a mistrial was declared, at appellant's request, on that same day because a Commonwealth witness referred to the suppressed identification. Appellant's second trial which commenced on January 13, 1976, resulted in the declaration of a mistrial because the jury, after over eleven hours of deliberation, reported to the court that they were hopelessly deadlocked. Appellant subsequently filed a motion to quash the indictment; this motion was denied on March 8, 1976. It was a result of a third trial on March 10, 1976, that appellant was finally convicted.

Appellant's first contention is that no manifest necessity existed to justify the lower court in declaring a mistrial in his second trial when the jury announced that it was hopelessly deadlocked. As a result, appellant contends that his third trial placed him in double jeopardy and thus violated his constitutional rights. We do not agree with appellant's contention.

74

■ A defendant may be tried without violation of his right not to be placed twice in jeopardy if his prior trial concluded without a verdict for reasons of manifest necessity. *United States v. Wilson*, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975); *Commonwealth v. Sullivan*, 484 Pa. 130, 398 A.2d 978 (1979); *Commonwealth v. White*, 476 Pa. 350, 382 A.2d 1205 (1978); *Commonwealth v. Bartolomucci*, 468 Pa. 338, 362 A.2d 234 (1976). Absent such manifest necessity, double jeopardy would attach and thus preclude a subsequent trial. *United States ex rel. Stewart v. Hewitt*, 517 F.2d 993 (3d Cir. 1975); *Commonwealth v. Wideman*, 453 Pa. 119, 306 A.2d 894 (1973).

■ On appellate review of the lower court's finding of manifest necessity, the circumstances of the trial must be examined to determine if any doubt exists regarding the propriety of the exercise of discretion by the lower court. *Commonwealth v. Bartolomucci, supra.* The length of time that a jury should deliberate is left to the sound discretion of the trial judge, whose decision is reversible only if there is an abuse of discretion or if a verdict is the product of an overworked or fatigued jury. *Commonwealth v. Sullivan, supra.* The supreme court emphasized in *Bartolomucci* the importance of having the court below inquire directly of the jury, either individually or through the foreman, about the possibility of the deadlock being overcome by further deliberations. Such an inquiry serves to remove any doubt, and thus, provides greater certainty as to the existence of a deadlock and the hopelessness of breaking it.

In the instant case, the jury was summoned back into the courtroom after eleven hours of deliberation. At that time, the following exchange occurred:

"THE COURT: All right, Members of the Jury, the Court has asked you to return to the courtroom, and I'd like to address a question to your foreman and ask him if he would advise the Court—if he or she would advise the Court as to the status of the deliberations of the jury. If you are divided, I do not wish you to announce the numbers or what the divisions are, or who among you may

be on which side of the question, or to indicate that in any way at all, but to state in a few words what your judgment is as to whether it is possible to arrive at a unanimous verdict in this case by continuing your deliberations this evening?

JURY FOREMAN: Stand up?

THE COURT: You can sit there.

JURY FOREMAN: Okay. We have discussed the case at great length and, in my own opinion, I feel that we are deadlocked. There are certain persons who are immovable on both sides.

THE COURT: All right, I don't want you to go into any more detail, but just for the sake of clarity and to make sure there would be no misunderstanding, I would ask you if you are morally certain that it is impossible to reach a verdict by continuing your deliberations either tonight or tomorrow morning after you would be recessed to retire to the hotel, sequestered until then, that is, if you are morally certain that regardless of the circumstances the deadlock would continue?

JURY FOREMAN: I am certain.

THE COURT: All right  .  .  .  ." (Partial N.T. 12, 13).

Thereupon, a brief conference between appellant, counsel, and the lower court judge, the Honorable James F. Clarke, occurred in chambers, and upon returning to the courtroom, Judge Clarke again questioned the jury.

"THE COURT: All right, Members of the Jury—or, Mr. Foreman, are you still in the same position that you announced a few moments ago?

JURY FOREMAN: Yes, I am, sir.

THE COURT: All right, the Court, from its communications with the jury, has every reason to believe and is satisfied that further deliberations by the jury in this case would be futile, and it appears that the Court is left with no alternative but to dismiss the jury by the declaration of a mistrial, it appearing that further deliberations would be futile on the announcement of the Foreman of his

certainty that it would not be possible for this jury to reach a unanimous verdict in this case." (Partial N.T. 15).

■ After reviewing the record in this case, we would conclude that the court below satisfactorily complied with the requirements of *Bartolomucci*. The court inquired directly of the jury, through the foreman, about the possibility of the deadlock being overcome by further deliberations. The foreman replied unequivocally that further deliberations would not resolve the deadlock. The judge's questioning of the jury indicates that he made a proper effort to determine whether a verdict could be reached, and the foreman's responses certainly served to remove any doubt about the existence of a deadlock and the hopelessness of breaking it. Under these circumstances, we would find that the court below did not abuse its discretion in declaring a mistrial for reasons of manifest necessity.

■ Appellant also contends that the in-court identification of him by Mr. Scipio lacked an independent origin sufficient to purge the taint of the suggestive out-of-court one-to-one confrontation at the East Liberty Police Station, and therefore, that this identification should not have been admitted into evidence. We disagree. Despite the suggestiveness of the one-to-one confrontation between appellant and Mr. Scipio at the East Liberty Police Station, we would hold that there was sufficient evidence on the record to justify the finding of the lower court that the in-court identification arose from a source independent of the confrontation at the police station.

■ Given a suggestive out-of-court confrontation, an in-court identification is admissible if, considering the "totality of the circumstances," *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the subsequent in-court identification arose from an origin "sufficiently distinguishable" from the illegal encounter as "to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963); *see Commonwealth v. Connolly*, 478 Pa. 117, 385 A.2d 1342 (1978);

*Commonwealth v. Taylor*, 472 Pa. 1, 370 A.2d 1197 (1977); *Commonwealth v. Fowler*, 466 Pa. 198, 352 A.2d 17 (1976); *Commonwealth v. Diggs*, 260 Pa.Super. 349, 394 A.2d 586 (1978).

■ To determine the existence of this independent basis, the time honored criteria promulgated by our supreme court are:

> " 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation and the length of time between the crime and the confrontation.' " *Commonwealth v. Fowler, supra*, 466 Pa. at 206, 352 A.2d at 21, *quoting Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).

Of these factors, the opportunity of the witness to observe the defendant at the time of the incident is considered the most important. *Commonwealth v. Brown*, 462 Pa. 578, 342 A.2d 84 (1975); *Commonwealth v. Wilson*, 450 Pa. 296, 301 A.2d 823 (1973); *see Commonwealth v. Diggs, supra.*

■ In the instant appeal, Mr. Scipio testified that on the day he was robbed, he observed appellant in broad daylight from a distance of five feet and stared at his face for a period of approximately fifteen to twenty seconds. He described the assailant as a black male, approximately six feet tall, and weighing one hundred and eighty pounds. He also noted that the assailant had an afro hairstyle and apparently wore a mustache and "pork chop" sideburns under his bandana. Mr. Scipio accurately described appellant's clothing and the gun that appellant used. Mr. Scipio testified that he had been robbed several times previous to November 1974, and that as a result of these experiences, he maintained his composure and concentrated on making a mental picture of appellant for identification purposes. There was no discrepancy between Mr. Scipio's initial description and appellant's actual description except that appellant wore a full beard. However, this was obscured to

Mr. Scipio's view by the bandana worn by appellant. Mr. Scipio never failed to identify appellant at any confrontation, nor did he ever misidentify appellant. *See U. S. v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Commonwealth v. Scott,* 469 Pa. 258, 365 A.2d 140 (1976); *Commonwealth v. Diggs, supra.* Under the circumstances set forth above, we find the in-court identification of appellant made by Mr. Scipio had an independent basis in fact sufficient to purge the primary taint of the suggestive out-of-court confrontation, and thus the identification was properly admitted into evidence.

Appellant's third and final contention is that the warrantless search of his automobile was not justified by exigent circumstances and that as a consequence, the fruits of the seizure should have been suppressed. In maintaining this contention, appellant asserts that at the time of the arrest, his appearance did not conform to the description given to police, that no exigent circumstances existed to justify the search, and that the search was not justifiable as incident to his arrest since he was outside of his automobile and the area searched could not be considered "within his immediate control".

It is well settled that an automobile, because of its mobility, may be searched without the aid of a search warrant if there is probable cause to believe that the automobile contains articles entitled to be seized. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Commonwealth v. Smith,* 443 Pa. 151, 277 A.2d 807 (1971); *Commonwealth v. Jones,* 233 Pa.Super. 461, 335 A.2d 789 (1975).

> "To justify a warrantless search of an automobile, the officer must have: '. . . independent probable cause to believe that a felony has been committed by the occupants of the vehicle, or that it has been used in the furtherance of the commission of a felony, or the officer must have a basis for believing that evidence of a crime is concealed within the vehicle, or that there are weapons

therein which are accessible to the occupants.' *Commonwealth v. Lewis,* 442 Pa. 98, 101, 275 A.2d 51, 52 (1971)." *Commonwealth v. Jones, supra,* 233 Pa.Super. at 465, 335 A.2d at 791.

*See also Commonwealth v. Martin,* 251 Pa.Super. 151, 380 A.2d 422 (1977).

█ In the instant case, the police received a description of appellant and his "getaway" car. They stopped appellant's car 12 minutes after receiving the radio description. Although appellant was not wearing his blue cap or green jacket, the police spotted the hat lying on the front seat and the green coat tucked under that seat. Cognizant of the fact that a weapon was used during the crime and that there was another adult occupant in the car, and considering the facts that appellant, his clothes and his car matched the descriptions provided to the police just twelve minutes before the stop, the police were justified in conducting a warrantless search of appellant's automobile.[7]

Accordingly, we would affirm the judgment of sentence.

VAN der VOORT and HESTER, JJ., join in this opinion.

OPINION IN SUPPORT OF REVERSAL

SPAETH, Judge:

After eleven hours, which is a long but by no means unusual period for a jury to deliberate, the jury was called back in the courtroom by the trial judge, on the judge's own initiative, and the following exchange took place:

"THE COURT: All right, Members of the Jury, the Court has asked you to return to the courtroom, and I'd like to address a question to your foreman and ask him if he would advise the Court—if he or she would advise the Court as to the status of the deliberations of the jury. If

7. Additionally, we note that the warrantless search of appellant's automobile is also justified under the "plain view" doctrine. *See Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *Commonwealth v. Harris,* 479 Pa. 131, 387 A.2d 869 (1978); *Commonwealth v. Getz,* 236 Pa.Super. 469, 344 A.2d 686 (1975).

you are divided, I do not wish you to announce the numbers or what the divisions are, or who among you may be on which side of the question, or to indicate that in any way at all, but to state in a few words what your judgment is as to whether it is possible to arrive at a unanimous verdict in this case by continuing your deliberations this evening?

JURY FOREMAN: Stand up?

THE COURT: You can sit there.

JURY FOREMAN: Okay. We have discussed the case at great length and, in my own opinion, I feel that we are deadlocked. There are certain persons who are immovable on both sides.

THE COURT: All right, I don't want you to go into any more detail, but just for the sake of clarity and to make sure there would be no misunderstanding, I would ask you if you are morally certain that it is impossible to reach a verdict by continuing your deliberations either tonight or tomorrow morning after you would be recessed to retire to the hotel, sequestered until then, that is, if you are morally certain that regardless of the circumstances the deadlock would continue?

JURY FOREMAN: I am certain.

THE COURT: All right. . . . ."

Partial N.T. 12–13.

In *United States ex rel. Webb v. Court of Common Pleas*, 516 F.2d 1034 (3d Cir. 1975), after over six hours of deliberations by the jury in the defendant's second trial, the trial judge, on his own initiative, recalled the jury, and engaged in the following colloquy:

The Court: Mr. Foreman, is there any hope of arriving at a verdict?

The Foreman: I don't believe so, sir.

The Court: Do you believe that further deliberation might be fruitful?

The Foreman: No, I do not.

The Court: Do you feel that your positions are so adamant that you couldn't possibly arrive at a unanimous verdict? Is that what you're telling me?

The Foreman: Yes, sir, I do believe that.

The Court: All right. I discharge you from further consideration of the case. You may report to the jury room tomorrow morning.

*Id.* at 1036.

The defendant was later retried and found guilty. On appeal from a denial of the defendant's petition for habeas corpus, the Third Circuit held that no manifest necessity had existed for the declaration of the mistrial. In so holding the Court, ADAMS, J., WEIS, J., dissenting, stated:

The trial judge raised the issue of jury deadlock *sua sponte.* Webb had not asked that a mistrial be declared nor had he consented to the jury's discharge. Indeed, the record does not show that the trial judge consulted with or informed either counsel prior to dismissing the jury. Nor has the prosecution suggested that he did so.

There is no indication, in the trial record or elsewhere, that prior to the court's summoning the jury back into the courtroom, the panel had ever intimated to the judge that they would be unable to agree upon a verdict. Thus the impetus for a mistrial was provided solely by the judge rather than by the jurors.

In addition, the trial judge directed his interrogatories solely to the jury foreman, and so far as the record reveals, the foreman, alone, indicated a response. The other members of the panel were in the box at this time, and it would concededly have been possible for another juror who disagreed with the foreman's assessment of the jury's status to make his opinion known to the court. However, unanimous consent cannot be inferred from a silent record. It may be, . . . that many citizens if placed on this jury would have voiced any disagreement they may have had with the opinion expressed by the foreman. There has been no empirical showing, however, that all jurors are so self-assertive. It is at least possible

that one or more of the jurors here stood sufficiently in awe of the authority of the court or were sufficiently swayed by the court's demand for orderly proceedings that they were deterred from making unsolicited comments on the jury's progress. In any event there is no clear showing that the foreman's responses here necessarily represented the unanimous opinion of the jury, or even that of a majority of the panel. The record, therefore, especially with regard to an adjudication affecting constitutional rights, does not furnish an adequate showing that it was the collective sentiment of the jury that they had reached an impasse.

*Id.* at 1043–44 (footnotes omitted).

The Third Circuit's holding in *Webb* should be followed in this case, not only because the Third Circuit's analysis is, at least in my opinion, persuasive,[1] but also because decisions by the Third Circuit interpreting Federal Constitutional rights are to be followed by the Courts of this Commonwealth until the United States Supreme Court has spoken on the issue.[2] *Schreiber v. Republic Intermodal Corp.*, 473 Pa. 614, 620 n. 5, 375 A.2d 1285, 1288 n. 5 (1977).

1. While the specific factual situation presented in *Webb* has apparently not arisen in cases in the other Circuits, the Ninth Circuit has ruled that the trial judge must question both the foreman and the jurors either individually or as a group before declaring a mistrial for reasons of manifest necessity. *See Arnold v. McCarthy*, 566 F.2d 1377, 1387 (9th Cir. 1978); *United States v. See*, 505 F.2d 845 (9th Cir. 1974). In *Nelson v. District Court of the State of Iowa, Etc.*, 543 F.2d 631, 632 (8th Cir. 1976), the Eighth Circuit specifically distinguished *Webb* on the grounds that since in *Nelson* the issue of an impasse in the jury was raised by the jury itself and not by the trial judge, the questioning of the foreman alone was sufficient. *See generally* Schulhofer, Jeopardy and Mistrials, 125 U.Pa.L.Rev. 449, 490 (1977); *United States v. Horn*, 583 F.2d 1124, 1128–29 (10th Cir. 1978) (discusses *Webb* approvingly).

2. In *Commonwealth v. Bartolomucci*, 468 Pa. 338, 362 A.2d 234 (1976), the Pennsylvania Supreme Court discussed the *Webb* decision in a footnote and stated that "preferable practice demands that the trial court . . . *ask each juror* if he or she agrees that a hopeless deadlock . . . exists." *Id.*, 468 Pa. at 348–49 n. 5, 362 A.2d at 239–40 n. 5 (emphasis added). The Court expressly left open as unnecessary to its decision in that case the question of whether an inquiry of the foreman alone was sufficient in any or all cases.

Here, as in *Webb*, the judge only questioned the foreman. Perhaps the judge's questions were not as leading as those asked by the judge in *Webb*, although the two sets of questions seem to me substantially the same. Be this as it may, the critical fact is that we cannot tell from the record whether "it was the collective sentiment of the jury that they had reached an impasse." 516 F.2d at 1044. We may not assume that the other jurors' silence constituted an agreement with the statements made by the foreman, for the silence could indicate that some jurors were "deterred from making unsolicited comments on the jury's progress." [3] *Id.* This is especially possible given the fact that the judge had initiated the inquiry; a diffident juror might say to himself, "Apparently the judge thinks we must be deadlocked, or he wouldn't have called us in. I'm not going to disagree with him."

In a case where the jurors themselves, through their foreman, send word to the trial judge that they are at an impasse, an individual polling or other interrogation of the jurors may be unnecessary.[4] Indeed, in *Commonwealth v. Myers*, 266 Pa.Super. 566, 582, 405 A.2d 1252, 1260 (1979), where the jurors brought up the possibility of a deadlock this court held that an individual polling was not required, and that where the trial judge questioned the foreman and several jurors individually and all the jurors generally, a mistrial was properly denied. This case is very different. Here, the possibility of a deadlock was first raised by the trial judge, and then the judge questioned only the foreman. Consequently, we do not—cannot—know whether in fact

**3.** We will not assume that all jurors are as assertive as the juror in *United States v. Lansdown*, 460 F.2d 164, 167 (4th Cir. 1972) who, when he heard the judge discussing the impasse in the jury, spontaneously requested that he be allowed ten more minutes to deliberate.

**4.** Indeed, in *Webb*, the Third Circuit stated:
   If the jury had, on its own initiative, declared itself deadlocked, there might have been less necessity for the judge to have inquired into the opinions of the other jurors since, in such situation, the jury would presumably have reached a consensus before reporting its deadlock to the judge.
516 F.2d at 1044 n. 56.

there was a possibility of a deadlock, or even whether the jurors had discussed the possibility. All we have is the foreman's personal assessment. ("[I]n my own opinion, I feel that we are deadlocked. There are certain persons who are immovable on both sides.") Given this combination of circumstances—that the judge brought up the issue, and that the foreman in answering the judge limited his answer to his own opinion—it was essential that before declaring a mistrial, the judge determine on the record whether the other jurors agreed with their foreman's assessment.[5]

In deciding the propriety of a declaration of mistrial, we are required to resolve all doubts in favor of the accused. See *Commonwealth v. Bartolomucci*, 468 Pa. 338, 349, 362 A.2d 234, 240 (1976). Reviewing the record in light of the Third Circuit's decision in *Webb*, I cannot hold that the record in this case sufficiently demonstrates the existence of so hopeless a deadlock as to make it manifestly necessary to declare a mistrial.

I should therefore order appellant discharged.

HOFFMAN, J., joins in this opinion.

## OPINION IN SUPPORT OF REVERSAL

CERCONE, President Judge:

Although I agree with the result Judge Spaeth reaches in his separate Opinion in Support of Reversal, I feel it necessary to clarify my position as to what the standard should be for trial judges where they sua sponte raise the question of whether the jury is deadlocked. *United States ex rel. Webb v. Court of Common Pleas*, 516 F.2d 1034 (3d Cir. 1975), states that it is necessary for the trial judge to know that "it was the collective sentiment of the jury that they had reached an impasse." 516 F.2d at 1044. Individual ques-

---

5. The trial judge initiated the deadlock discussion in *Commonwealth v. Kivlin*, 267 Pa.Super. 270, 406 A.2d 799 (1979). However, the judge there did not question only the foreman; he also questioned the jurors generally whether they agreed with the foreman's assertion that they were hopelessly deadlocked, and in response the jurors nodded their heads that they did agree with their foreman.

tioning of jurors is not necessary in every case in order for the trial judge to understand the jury's sentiment. I would hold that if the trial judge is assured by the consensus of the jurors that they are deadlocked, individual questioning is not necessary.

Our court addressed a similar situation in *Commonwealth v. Kivlin*, 267 Pa.Super. 270, 406 A.2d 799 (1979). There, the trial judge initiated the deadlock discussion after several days of the jury's deliberations. The trial judge questioned the jury foreman and then the entire jury generally as to whether they were deadlocked. After the foreman asserted a verdict would not be reached if they deliberated any longer, the jurors then either agreed or nodded their heads in answer to the same general question posed to them. In *Kivlin*, we said that "[t]here is no requirement that the court [question each juror individually.] See e. g., *Commonwealth v. White*, supra, [476 Pa. 350, 382 A.2d 1205 (1978)]; *Commonwealth v. Monte*, supra, [459 Pa. 495, 329 A.2d 836 (1974)]." *Commonwealth v. Kivlin*, 267 Pa.Super. at p. 279, 406 A.2d at p. 802. We then held that the general questioning was sufficient on the facts of that case.

Although Judge Spaeth recognizes that individual polling may not be necessary where the jurors raise the issue that they have reached an impasse, *Commonwealth v. Myers*, 266 Pa.Super. 566, 405 A.2d 1252 (1979), it is not clear whether he would acknowledge that rule where the court, sua sponte, raises the issue. I espouse the view set forth in *Kivlin* that the court's tactic in generally questioning the jury may be sufficient to assure the trial judge of the jury's deadlock without individual questioning.

In the instant case, however, the judge's sua sponte inquiry to the jury foreman did not meet any of the required standards to determine the consensus of the jurors on the deadlock issue. Moreover, the foreman only stated "in [his] own opinion" the jury was deadlocked. This is not sufficient to satisfy *Commonwealth v. Kivlin* or *United States ex rel. Webb v. Court of Common Pleas*, supra, and therefore I would hold there was no manifest necessity upon which the

trial judge could have declared a mistrial. I would order appellant discharged.

HOFFMAN, J., joins in this opinion.