**UNITED STATES of America**

v.

**Edward M. BECTON et al.**

**Crim. No. G–80–3.**

United States District Court,
S. D. Texas,
Galveston Division.

June 23, 1980.

George O. Jacobs, Houston, Tex. and Tom Beery, Asst. U. S. Attys., Brownsville, Tex., for the United States of America.

˙ Daniel M. Marlowe, Oakland, Cal., for defendants Major Becton and Stanley Becton.

Edward A. Mallett, Houston, Tex., for defendant Vincent E. Damion.

Richard Thornton, Galveston, Tex., for defendant Robert Howard Pollak.

Gerald H. Goldstein, San Antonio, Tex., for defendant Barry Mirojnick.

Robert G. Turner, Houston, Tex., for defendant Robert Jones.

## EXHIBIT A

## ORDER

HUGH GIBSON, District Judge.

Before the Court are the motions of defendants MAJOR BECTON, STANLEY BECTON, ROBERT JONES, ROBERT POLLAK, VINCENT DAMION and BARRY MIROJNICK to dismiss for prior jeopardy, for judgment of acquittal and for stay of proceedings. The Court has considered the record, the briefs of the parties and heard oral argument on the motions, and is of the opinion that the motions should be denied.

The Court is further of the opinion that defendants' double jeopardy claim, which is predicated upon the insufficiency of the evidence, is frivolous in that there would be no reasonable chance or prospect of establishing a double jeopardy claim on appeal.

It is therefore ORDERED, ADJUDGED and DECREED that

(1) Defendants' motions for judgment of acquittal are DENIED;

(2) Defendants' motions to dismiss for prior jeopardy are DENIED;

(3) Defendants' double jeopardy claim, which is predicated on the insufficiency of the evidence, is frivolous in that there would be no reasonable chance or prospect of establishing a double jeopardy claim on appeal; and

(4) Defendants' motions for stay of proceedings are DENIED.

## SUPPLEMENTAL MEMORANDUM

### INTRODUCTION

HUGH GIBSON, District Judge.

This is a criminal case in which 37 people were indicted in a three–count indictment on charges of conspiracy to import marijuana in violation of 21 U.S.C. § 963 and 952(a), Count One; conspiracy to possess marijuana with the intent to distribute it in violation of 21 U.S.C. § 846 and 841(a)(1), Count Two; and possession of marijuana with the intent to distribute it in violation of 21 U.S.C. § 841(a)(1), Count Three. This Court ordered the case tried in six separate trials, and the fifth trial began May 12, 1980.

Three witnesses testified in the Government's case in chief, Drug Enforcement Agent John K. Marshall, Customs Patrol Officer Oswaldo Montalvo, and Pasadena Police Sergeant K. F. McCreight. These officers were participants in "Operation Mainstay," a task force of local, state and federal law enforcement agencies working to reduce marijuana smuggling on the Texas Gulf Coast.

Although only three days of testimony was presented, the Government did not rest until May 27 because of a number of delays. Defendants' motions for judgment of acquittal were heard on May 28, and the Court granted all defendants' motions as to Count One (conspiracy to import), and denied the motions as to Counts Two (conspiracy to possess) and Three (possession with intent to distribute). No further evidence was put on by the defense or the Government, and the case was submitted to the jury on June 2, 1980.

On June 5, 1980, after approximately 16 hours of deliberation, three notes indicating deadlock, and an *Allen* charge from the Court, a mistrial was declared, *sua sponte*, due to the inability of the jury to reach unanimous verdict. Renewed motions for judgments of acquittal were made after the jury was discharged. The Court denied the motions and ordered the case set for trial on June 17, 1980.

Within seven days of the jury's discharge, all of the defendants in the fifth trial moved for judgment of acquittal, to dismiss the indictment for former jeopardy and for stay of proceedings. The Court heard the argument of counsel, reviewed the record and the briefs submitted in support of the motions, and denied the motions. The Court further found that defendants' double jeopardy motion was frivolous. (Order of June 11, 1980—Exhibit A).

Defendants have appealed this Court's denial of their double jeopardy motion and have obtained from the Fifth Circuit Court of Appeals a two–week stay of the trial scheduled for June 17. In its order staying the scheduled trial, the Court of Appeals provided that the stay was without prejudice to this Court's filing a supplemental memorandum in support of its order of June 11, 1980. This memorandum follows to enable the Court of Appeals to review as expeditiously as possible the defendants' appeal.

### ISSUES

Essentially, the Court is presented with two issues. The first issue is whether a valid double jeopardy claim based upon the insufficiency of the evidence is presented when a mistrial has been declared due to a deadlocked jury. The second issue, which goes hand in hand with the first, is whether, assuming that a valid double jeopardy claim is presented, that claim is frivolous within the meaning of *United States v. Dunbar*, 611 F.2d 985 (5th Cir. 1980) (en banc).

## FINDINGS OF FACT

"Operation Mainstay" focused on the Galveston–Freeport area after about December of 1978, and the Intercoastal Marina at Freeport was placed under investigation. The Marina is located on the Intercoastal Waterway and is accessible via the Casco Road and the Waterway. (See Gov. Exhs. Nos. 15 and 86).

Beginning in July 1979, Agent Marshall went to the Marina three or four times a week. He dressed in civilian clothes, hung around, drank beer, and helped fuel the boats—generally surveilling the area in an undercover capacity. He continued this activity until December 10, 1979. At all times between July of 1979 and December 19, 1979, Agent Marshall worked with Customs Patrol Officer Bobby Glenn Weaver and two of Weaver's confidential informants, Tommy Troutwine, the manager of the Marina, and Bob Brushingham, its owner.

During his surveillance, Agent Marshall noticed that the Marina housed about 35–40 boats and had heavy weekend and light weekday traffic. The boats in the Marina were primarily pleasure boats most often used on the weekends and when the weather was warm. At other times, the boats were repaired and the bulk of activity at the Marina centered around the workshed near the Marina entrance. There was very little activity in the fuel shed area except for the refueling of boats.

On December 19, 1979, the day of the raid at the Marina, Agent Marshall received a phone call in his Houston office from one of the law enforcement communication sectors that there was some activity at the Marina. Marshall left his office around 4:30 or 5:00 p. m. and went to the Freeport area. Upon arriving at Freeport, Marshall went south along Highway 332 until coming to the Surfside bridge. It was about 6:30–6:45 p. m. then, and Marshall drove back and forth across the bridge several times. From the bridge he could see a large boat docked at the Marina and two trucks backed up toward the boat and the dock. It was dark and he could not see any activity at the Marina.

He then went to the Beach, Bait and Tackle store, located one mile north of the Marina on Highway 332. While at the store, Agent Marshall saw Steven Kalish (Gov. Exh. 67). (Kalish was tried in the third trial and was convicted on all three counts of the indictment.) This was at approximately 7:00 to 7:30 p. m. Agent Marshall left the store, drove around and then went to the Coast Guard station where a command post had been set up.

At about 7:40 that evening Officer Montalvo received a call from Officer Weaver telling him to report to the Coast Guard station command post. Officer Montalvo arrived at the Coast Guard station about 7:50 p. m. He remained there approximately five minutes and left with Officer Richardson to go to "the rocks" to conduct surveillance. The rocks is a shore area about 75 yards across from and 100 yards west of the Intercoastal Waterway from the Marina. (See Gov. Exhs. 12 and 18). CPO Montalvo, equipped with night vision goggles, nightscope and 75 x 50 binoculars, arrived at the rocks at about 8:00 p. m.

From that position, he was able to see the vessel (later determined to be the MR. JAKE) and three 18–wheel trucks backed up toward the MR. JAKE. He counted ten people moving large bales along a platform from the MR. JAKE to the trucks but could not identify anyone because of the inherent limitations of the night vision and nightscope equipment. (Apparently, the goggles allow one to see objects but not their color—everything is portrayed in different shades of green.)

CPO Montalvo was at "the rocks" 25 to 30 minutes (until approximately 8:30 p. m.). His view of the scene was limited in that he was not able to see behind and to the right of MR. JAKE nor anyone outside of the immediate area of the JAKE. There were no lights on the boat; however, some lights were burning at the fuel docks next door.

After Montalvo reported that one of the trucks was close to being fully loaded, CPO Weaver instructed Montalvo and Richardson to move to Highway 332 and continue

surveillance. The officers proceeded to the Beach, Bait and Tackle store, parked and continued surveillance with the night vision equipment. They stayed at the store for approximately 25 to 30 minutes where they had an unobstructed view of the entrance to the Marina.

They saw no traffic enter or depart the Marina during this time and until 9:00 p. m. At about 9:00, an unidentifiable van left the area. Shortly thereafter, one of the 18–wheel trucks left the Marina, proceeded east along Casco Road and then north on Highway 332. Officers Richardson and Montalvo in one car, and Officer Graham in another, followed the truck for approximately five miles—enough distance to assure that the truck was out of CB range—and stopped the truck.

A search of the truck revealed that the truck was packed with plastic bales of a substance field–tested to be marijuana. This information was relayed by radio to Agent Marshall at the Coast Guard station, and the officers who had gathered there in anticipation of the raid got in their vehicles and proceeded toward the Marina.

The officers left in three vehicles, two vans and a car, and proceeded in caravan fashion to the Marina. Seven officers were in the first van. CPO Weaver and CPO Aguilar were in the second van. Department of Public Safety Officer T. Davis drove the third car accompanied by Agent Marshall and Officer Butchee of the La-Porte Police Department.

As the vehicles were leaving the Coast Guard station command post, Pasadena Police Department Sergeant McCreight and Drug Enforcement Agent Paul Herring boarded a helicopter to be used in the raid. The helicopter was equipped with a public address system and high–powered search light, often referred to as the "night sun" because of its one–million candle power capacity. The helicopter took off from the Coast Guard station and flew out over the Gulf to give the police caravan an opportunity to reach the Marina. The caravan went east from the Coast Guard station, then north on Highway 332 and across the Freeport bridge, and then west along Casco Road.

The first van moved into the Marina. The second van driven by CPO Aguilar dropped Officer Weaver off, turned around and left almost immediately. Agent Marshall stopped for a minute or two–long enough to question two or three vehicles which departed the Amoco lot just east of the Marina and to prevent escape from the Marina by vehicle.

Meanwhile, as the caravan proceeded west on Casco Road, the helicopter had taken a position just north of the Marina. As the first van entered the Marina and the officers got out to make the arrests, the helicopter descended on the fuel shed area to an altitude of about 300 feet. The light was turned on and the helicopter began to circle the area between the fuel shed, the trucks and the boat. As the light was turned on, Officer McCreight noticed several things. He saw the officers in the first van get out of the van and run around both sides of the trucks backed up to the docks. He saw a large group of people–approximately 20, he thought–between the boat and the trucks. At the same time as the light was turned on and the officers were moving toward the boat area, Agent Herring announced over the p.a. system: "Police–lay down!" A large number of people immediately fell to the ground, but some ran.

Two individuals, particularly caught Officer McCreight's attention. Only one is a defendant in this trial. This individual was seen running from the area of the conveyor belts. He dove into the water and appeared to stop almost immediately upon hitting the water. Apparently, the tide was high that night and the rocks and boards just below the surface could not be seen. Defendant Robert Jones was the only person injured that night; he suffered injuries to his hands, wrist and nose.

Within two to three minutes of the arrival of the first van at the Marina, Officers Marshall, Butchee and Davis entered the Marina. Officer Davis drove approximately one–third of the way into the Marina,

stopped, and let Officer Butchee out of the car. Officers Davis and Marshall drove toward the boat and parked behind the first law enforcement van that entered the Marina, which was parked in front of and between the two 18–wheel trucks backed up to the dock. (See Government Exh. No. 86).

Agent Marshall got out of his car and smelled a strong odor of marijuana. He walked along the east side of the truck parked nearest the boat shed area and stopped next to a stack of boxes at the rear of that truck. This placed Agent Marshall at what has been referred to as the fuel shed area, an area about 43 yards in length and 20 yards in width, and consisting of that area between the boat, the road west of the conveyor belts, the trucks, and the fuel shed (see Gov. Exhs. Nos. 15 and 86). The ground in this area is hard shell, dirt and some concrete.

It was a December night, six days before Christmas, in the middle of the week. It was shortly after 9:00 p. m. The weather was clear and cool, and most, if not all, of the law enforcement officers participating in the raid were wearing jackets with PO-LICE written on the back. Mr. Marshall was wearing a sheepskin jacket. Upon arriving at the boxes, Agent Marshall observed a large number of people laying on the ground with several officers standing around. He was aware of some noise or activity behind him and to the west of the second truck; but his attention was drawn toward the boat where he saw Officer Mike Henson on the dock.

Mr. Marshall assisted Officer Henson with six individuals he had in custody on the dock. Marshall then made a quick topside inspection of the vessel, "MR. JAKE," which revealed marijuana in the companionways and holds of the boat. In addition to the electric conveyors leading from the vessel to the trucks (see Gov. Exhs. Nos. 9 and 11), there were mechanical rollers in the hold of the boat to assist in the unloading operation. Marijuana bales were on the conveyor belts; there were extension cords, first aid supplies, a couple of duffel bags full of towels, coveralls, gloves, etc., on the ground; the port deck of MR. JAKE had a lot of marijuana debris on it; and marijuana was all over the ground by the conveyor belts. (See Gov. Exhs. Nos. 9, 11, 17, 21 and 22).

When Marshall got off the boat, he proceeded to identify the 34 people arrested and lying down in the fuel shed area. Two others were brought to that area later, Mr. Edd Martin, the driver of the truck that had departed the Marina, and another individual who was found hiding on an axle under one of the trucks.

The Marina was not completely secured the night of December 19, and at least two vehicles left the Marina, a red truck and a van. The Marina is open to the public; there are no gates; the Marina was hard to watch, and the front of the Marina could not been seen by surveillance. Also, there was no surveillance from the time that Officer Montalvo left the Beach, Bait & Tackle Shop to stop the 18–wheel truck that left the Marina until the law enforcement caravan arrived at the Marina from the Coast Guard station.

However, the evidence showed that a person was stationed at the westernmost entrance of the Marina with a barrel in the middle of the road and a strip of safety tape was placed across the easternmost entrance to the Marina. Tommy Troutwine, a confidential informant, was in charge of security that night.

When Mr. Marshall entered the Marina, he thought everyone in the Marina would be questioned, and everyone behind the trucks and toward the boat would be arrested. In fact, John Socha, a volunteer assistant fire chief from Freeport was arrested at the Marina, detained and later released by Agent Marshall. Agent Marshall explained the reasons for Mr. Socha's release. When Mr. Socha was brought to Agent Marshall about a half hour after the initial arrests, around 9:45 p. m., by an officer who arrested him in the front of the Marina, Mr. Marshall asked Mr. Socha his name and what he was doing in the area. Mr. Socha gave his name and said he was a volunteer

assistant fire chief at Surfside, had seen the commotion and had come down to investigate in case there was a fire. Mr. Socha was asked to sit down at the conveyor belts until his story could be checked out. Some time later, he was identified by at least two local law enforcement officers and was released with an apology from Mr. Marshall. Mr. Socha was the only individual released that night.

Most of the arrests were made by those law enforcement officers in the first van. Marshall made no arrests that night but identified the defendants as persons he saw in the fuel shed area that night. He identified each individual at the scene by asking him to show his face and give his name. He looked at each individual twice on the ground, sometimes with a flashlight, searched each individual, and later walked them in groups from one of the trucks to a bus at the entrance of the Marina. These individuals were taken to the Galveston County jail where they were photographed, their names affixed to the pictures, and booked. (See Gov. Exhs. Nos. 80, 81, 82, 83, 84, 85 and 87).

As a result of the raid, 36 people were arrested at the Marina, five 18–wheel trucks, the vessel "MR. JAKE," and 50 tons of marijuana were seized.

## CONCLUSIONS OF LAW

1. *No valid double jeopardy claim is presented.*

■ Although jeopardy attaches when the jury is empaneled and sworn, *Crist v. Bretz*, 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978); *Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), it has long been the rule that the purposes of the double jeopardy clause are not endangered by retrial after a mistrial has been ordered in most circumstances. *United States v. Opager*, 616 F.2d 231 (5th Cir.

1980). Those circumstances in which retrial is barred involve some form of bad faith prosecutorial or judicial overreaching.[1] *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *United States v. Opager, supra.* Otherwise, a defendant may be retried if he consents to retrial or retrial is mandated by some form of manifest necessity. *United States v. Aguiar*, 610 F.2d 1296, 1301 (5th Cir. 1980).

■ This case falls squarely within the manifest necessity exception to the double jeopardy clause announced in *United States v. Perez*, 9 Wheat. 579, 6 L.Ed. 165 (1824), and recently reiterated by the Supreme Court in *United States v. Sanford*, 429 U.S. 14, 15, 97 S.Ct. 20, 21, 50 L.Ed.2d 17 (1976):

" . . . The trial of respondents on the indictment terminated, not in their favor, but in a mistrial declared, *sua sponte*, by the District Court. Where the trial is terminated in this manner, the classical test for determining whether the defendants may be retried without violating the Double Jeopardy Clause is stated in Mr. Justice Story's opinion for this Court in *United States v. Perez*, 9 Wheat. 579, 580 [6 L.Ed. 165] (1824):

'We are of the opinion, that the facts constitute no legal bar to a future trial. The prisoner has not been convicted or acquitted, and may again be put upon his defence. We think that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.'

"The Government's right to retry the defendant, after a mistrial, in the face of

---

1. The defendants do not contend that prosecutorial abuse created the mistrial. Nor do they argue that the mistrial was declared by the trial court under an aberrant procedure. Therefore, cases such as *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *Dow-*

*num v. United States*, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); *United States v. Gordy*, 526 F.2d 631 (5th Cir. 1976); and *Webb v. Court*, 516 F.2d 1034 (3rd Cir. 1975), are inapposite.

his claim of double jeopardy is generally[2] governed by the test laid down in *Perez, supra.* The situation of a hung jury presented here is precisely the situation that was presented in *Perez, supra,* and therefore the Double Jeopardy Clause does not bar retrial of these respondents on the indictment which had been returned against them."

*Accord, Downum v. United States,* 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963) (". . . a second trial may be had although the jury impaneled for the first trial was discharged without reaching a verdict and without the defendant's consent. The classic example is mistrial because the jury is unable to agree.")

This Court declared a mistrial, *sua sponte,* after receiving three notes from the jury indicating that they could not agree. Furthermore, after the jury's first note indicating they were deadlocked, the Court instructed the jury to continue to deliberate and attempt to reach a verdict if it could do so without violence to individual judgment (*Allen* charge). The Court again instructed the jury to continue its deliberations after the second note. After the Court received the jury's third note, under the circumstances, the Court had no choice but to declare a mistrial and discharge the jury. All defendants objected except Mr. Mirojnick who was silent. There can be no more clear cut case of manifest necessity for the declaring of a mistrial.

Defendants would attempt to distinguish this case from *Perez* and place this case within the protections of the Double Jeopardy Clause under the decision of the Supreme Court in *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). In *Burks,* the Court held that the Double Jeopardy Clause of the Fifth Amendment precludes a second trial once the reviewing court has found the evidence insufficient as a matter of law to sustain the jury's verdict of guilty.

Defendants' argument takes the following form. Adopting the reasoning of the Supreme Court in *Burks,* that had the trial court granted defendant's motion for judgment of acquittal, retrial would have been barred by the Double Jeopardy Clause, defendants argue that *if* this Court had granted their motions for judgment of acquittal, as it should have, their retrial would be barred. Therefore, they argue, they are entitled to have this Court's denial of their motions for judgment of acquittal and the sufficiency of the evidence reviewed by the Court of Appeals before being put to trial a second time.

Defendants base their argument essentially on three cases: *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); and *Wilkinson v. United States,* 601 F.2d 791 (5th Cir. 1979).

In *Wilkinson,* the appellants, Stewart and Wilkinson were put to trial with nine co-defendants on charges of conspiring to conduct an illegal gambling business and the substantive offense of conducting an illegal gambling business. After two days of trial, the government dismissed the indictment as to the nine co-defendants. The trial proceeded two and a half additional days, and the case was submitted to the jury. The defendants' motions for judgments of acquittal were timely made, and the district court denied the motions. When the jury could not reach a unanimous verdict, the court declared a mistrial and ordered defendants to be tried again. Defendants again moved for judgment of acquittal, and again these motions were denied.

Upon the defendants' second trial, the jury found them guilty of the conspiracy but not the substantive count. Also, the government's witnesses included two persons who had been indicted with the defendants but had not testified in the first trial. On appeal, the defendants argued that the evidence adduced at their first trial was not sufficient to support a conviction and that their motions for judgment of acquittal should have been granted.

---

**2.** If the mistrial is declared at the behest of the defendant, the manifest necessity test does not apply. See *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976).

The issue presented to the Court of Appeals was whether, on appeal of the second trial, defendants' failure to seek interlocutory review of the district court's denial of their motions for judgment of acquittal in the first trial diminished their right to have the Court of Appeals review the sufficiency of the evidence in the first trial. The court held that it could review the sufficiency of the evidence in the first trial and ultimately found the evidence sufficient.

However, in reaching this conclusion, the court stated:

> "After their first trial Wilkinson and Stewart could have moved to dismiss the indictment on double jeopardy grounds and under *Abney* could have appealed an adverse decision immediately."

*United States v. Wilkinson, supra* at 795.[3]

This language, although dicta, must be given at least instructional value, and it is this language along with some of the language in *Burks* and *Abney* that defendants rely on in their assertion of double jeopardy. The defendants draw the Court's attention to the following language in *Burks*:

> "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials. The Clause does not allow 'the State . . . to make repeated attempts to convict an individual for an alleged offense,' since '[t]he constitutional prohibition against "double jeopardy" was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense.' *Green v. United States*, 355 U.S. 184, 187 [78 S.Ct. 221, 2 L.Ed.2d 199] (1957); see *Serfass v. United States*, 420 U.S. 377, 387–388 [95 S.Ct. 1055, 43 L.Ed.2d 265] (1975); *United States v. Jorn*, 400 U.S. 470, 479 [91 S.Ct. 547, 27 L.Ed.2d 543] (1971)."

*United States v. Burks, supra* at 11, 98 S.Ct. at 2147.

Defendants also point to this language in *Abney v. United States*:

> ". . . Because of this focus on the 'risk' of conviction, the guarantee against double jeopardy assures an individual that, among other things, he will not be forced, with certain exceptions, to endure the personal strain, public embarrassment, and expense of a criminal trial more than once for the same offense. It thus protects interests wholly unrelated to the propriety of any subsequent conviction. Mr. Justice Black aptly described the purpose of the Clause:
>
> > " 'The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' *Green, supra*, at 187–188 [78 S.Ct. 221].

Accord, *Breed v. Jones*, 421 U.S. 519, 529–530 [95 S.Ct. 1779, 44 L.Ed.2d 346] (1975); *Serfass v. United States*, 420 U.S. 377, 387–388 [95 S.Ct. 1055, 43 L.Ed.2d 265] (1975); *Jorn, supra* [400 U.S.] at 479 [91 S.Ct. 547]. Obviously, these aspects of the guarantee's protections would be lost if the accused were forced to 'run the gauntlet' a second time before an appeal could be taken; even if the accused is acquitted, or, if convicted, has his conviction ultimately reversed on double jeopardy grounds, he has still been forced to endure a trial that the Double Jeopardy Clause was designed to prohibit. Consequently, if a criminal defendant is to

---

**3.** *Wilkinson* was decided in August of 1979, approximately five months before the Court of Appeals for the Fifth Circuit held in *United States v. Dunbar*, 611 F.2d 985 (5th Cir. 1980) (en banc), that a district court could proceed with trial during the pendency of an appeal from a denial of a double jeopardy motion if it certified the motion as frivolous. The application of Dunbar to this case is discussed *infra*.

**1022**

avoid exposure to double jeopardy and thereby enjoy the full protection of the Clause, his double jeopardy challenge to the indictment must be reviewable before that subsequent exposure occurs."

*Abney v. United States, supra* 431 U.S. at 661–662, 97 S.Ct. at 2041.

Defendants ask this Court to combine *Wilkinson, Burks* and *Abney* to recognize a double jeopardy claim based upon this Court's potentially wrongful denial of their motions for judgments of acquittal.

This they argue protects them from being put to trial twice for the same offense and prevents the defendants from having to endure the stress, harassment and embarrassment of a second trial should the court find the evidence insufficient. Additionally, it prevents the prosecution from having a second bite at the apple.

The argument is not without its appeal, but this Court has great difficulty with it.

The Court has no problem with the statement in *Wilkinson* that defendants could have moved to dismiss the indictment on double jeopardy grounds, and could have appealed an adverse decision immediately under *Abney.* Of this there can be no doubt. Jeopardy attached when the jury was sworn. The difficulty with *Wilkinson* for this Court is on what basis the defendants could move to dismiss the indictment. Because the *Wilkinson* court was reviewing the sufficiency of the evidence in the first trial, one could infer that defendants could base their double jeopardy claim on the insufficiency of the evidence (or the court's wrongful denial of the defendants' motions for judgment of acquittal); but the Court does not say that this is the case, and this Court is not willing to so hold until further developments by the Court of Appeals.

■ This Court is of the opinion that this case is controlled by *Perez, supra,* and that the only valid double jeopardy claim that could be made after mistrial due to a deadlocked jury would be one based on lack of manifest necessity (judicial overreaching), *United States v. Downum, supra* ; or bad faith prosecutorial overreaching, *United*

*States v. Opager, supra,* and the cases cited therein.

■ "The double jeopardy clause provides three related protections:

It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.

*United States v. Wilson,* 420 U.S. 332, 343, 95 S.Ct. 1013, 1021, 43 L.Ed.2d 232 (1975), *quoting North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)."

*United States v. Smith,* 574 F.2d 308 (5th Cir. 1978). In the instant case, we have neither conviction nor acquittal. The trial of this case did not terminate in favor of the defendants but in a mistrial declared, *sua sponte,* by this Court. For this reason, the *Perez* case controls the disposition of defendants' double jeopardy claims.

This Court also has difficulty with the *Wilkinson* language and defendants' argument because they call for a major extension of *Burks.* *Burks* is clearly distinguishable from this case and should be limited to its facts and holding. Defendant Burks was tried in United States District Court for robbery and his principal defense was insanity. Before the case was submitted to the jury, the court denied a motion for judgment of acquittal. Subsequently, the jury found Burks guilty as charged.

The Court of Appeals held that the government had failed to rebut Burks' proof as to insanity and reversed and remanded to the district court to determine whether a directed verdict of acquittal should be entered or a new trial ordered, citing, *inter alia,* as authority for such a remand 28 U.S.C. § 2106, which authorizes federal appellate courts to remand a cause and "direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

The Supreme Court held that the Double Jeopardy Clause of the Fifth Amendment

precluded a second trial once the reviewing court has found the evidence insufficient to sustain the jury's verdict of guilty, and the only just remedy available for the court under 28 U.S.C. § 2106 was the entry of a judgment of acquittal. *Burks v. United States, supra*, 437 U.S. at 18, 98 S.Ct. 2150.

In the instant case, the only determination yet made on the sufficiency of the evidence has been by this Court. This Court has found the evidence sufficient as a matter of law and denied the defendants' motions for judgment of acquittal. Therefore, this case is in a very different posture than *Burks* where there was conviction, appeal and reversal. Here we have no conviction and a finding by the court that the evidence is sufficient as a matter of law. The distinction is significant because *Burks* is premised upon a finding by the appellate court that the evidence was insufficient as a matter of law. Because it was insufficient, Burks could not be retried. Here, however, the court has found the evidence sufficient as a matter of law, and another court has not found otherwise.

The Court is also troubled by defendants' argument for another reason. In *Abney*, the court held that a district court's pretrial order denying a defendant's motion to dismiss the indictment on double jeopardy grounds is a final decree within the meaning of 28 U.S.C. § 1291 and immediately appealable under the collateral order exception to the final judgment rule announced in *Cohen v. Beneficial Ind. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). However, in reaching its decision, the court looked to three factors: finality, the collateral nature of the claim and the irreparable loss of an important right if not immediately reviewed. The court stated:

"... In the first place there can be no doubt that such orders constitute a complete, formal, and, in the trial court, final rejection of a criminal defendant's double jeopardy claim. There are simply no further steps that can be taken in the District Court to avoid the trial the defendant maintains is barred by the Fifth Amendment's guarantee. Hence, *Co-*

*hen*'s threshold requirement of a fully consummated decision is satisfied.

"Moreover, the very nature of a double jeopardy claim is such that it is collateral to, and separable from the principal issue at the accused's impending criminal trial, i. e., whether or not the accused is guilty of the offense charged. In arguing that the Double Jeopardy Clause of the Fifth Amendment bars his prosecution, the defendant makes no challenge whatsoever to the merits of the charge against him. Nor does he seek suppression of evidence which the Government plans to use in obtaining a conviction. See *DiBella v. United States*, 361 U.S. 121 [82 S.Ct. 654, 7 L.Ed.2d 614], *supra*; *Cogen v. United States*, 278 U.S. 221, 49 S.Ct. 118, 73 L.Ed. 275 (1929). Rather, he is contesting the very authority of the Government to hale him into court to face trial on the charge against him. *Menna v. New York*, 423 U.S. 61 [96 S.Ct. 241, 46 L.Ed.2d 195] (1975); *Blackledge v. Perry*, 417 U.S. 21, 30 [94 S.Ct. 2098, 40 L.Ed.2d 628] (1974); *Robinson v. Neil*, 409 U.S. 505, 509 [93 S.Ct. 876, 35 L.Ed.2d 29] (1973). The elements of that claim are completely independent of his guilt or innocence. ... Thus, the matters embraced in the trial court's pretrial order here are truly collateral to the criminal prosecution itself in the sense that they will not 'affect, or ... be affected by, decision of the merits of this case.' *Cohen*, 337 U.S., at 546 [69 S.Ct. 1221].

"Finally, the rights conferred on a criminal accused by the Double Jeopardy Clause would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence."

*Abney v. United States, supra*, 431 U.S. at 659–660, 97 S.Ct. at 2040. It is significant that the court described the double jeopardy claim as one "completely independent of his guilt or innocence."

In the instant case, defendants are not so much contesting the authority of the government to hale them into court to face

trial on the charges against them as they are challenging the *merits* of the government's case against them. In *Abney*, the court was very careful to hold that other claims presented by defendant in his motion to dismiss were not immediately appealable unless they fell within *Cohen*'s collateral-order exception to the final judgment rule. Accordingly, the court held that the court of appeals did not have jurisdiction to pass on the merits of petitioner's challenge to the sufficiency of the indictment at that juncture in the proceedings. The Court stated:

> ". . . we think it clear that the District Court's rejection of petitioners' challenge to the sufficiency of the indictment does not come within the *Cohen* exception. First, an order denying a motion to dismiss an indictment for failure to state an offense is plainly not 'collateral' in any sense of that term; rather it goes to the very heart of the issues to be resolved at the upcoming trial. Secondly, the issue resolved adversely to petitioners is such that it may be reviewed effectively, and, if necessary, corrected if and when a final judgment results.

■ Certainly, the issue of whether the evidence is sufficient goes to the heart of the Government's case and is "plainly not 'collateral' in any sense of that term." *Abney, supra,* 431 U.S. at 663, 97 S.Ct. at 2042. Since denial of a motion for judgment of acquittal is not ordinarily appealable until a final decision has been rendered, *Wilkinson, supra* at 794, the Court has great difficulty in finding that a different result is necessitated because of a mistrial. This is especially true in light of the holding in *Wilkinson* that the sufficiency of the evidence in the first case may be reviewed on appeal of

the second case. Thus, the issue resolved adversely to defendants is such that it may be reviewed effectively and if necessary, corrected if and when a final judgment results.[4]

■ Furthermore, a finding that a valid double jeopardy claim based upon the sufficiency of the evidence is presented when the trial court denies a motion for judgment of acquittal and a mistrial occurs would lead to a result clearly inconsistent with existing jurisprudence. Every denial of a judgment of acquittal in cases in which a mistrial occurred would be appealable for the reason that if the trial court had granted it, double jeopardy would prevent retrial. This cannot be the law. Until the Fifth Circuit more clearly holds that a valid double jeopardy claim based upon the insufficiency of the evidence is presented when a trial court has denied a defendant's motion for judgment of acquittal and a mistrial has been declared due to a deadlocked jury, with all due deference to the *Wilkinson* panel, this Court concludes that no valid double jeopardy claim has been presented by defendants.[5]

2. *Assuming a valid double jeopardy claim is presented, the claim is frivolous.*

■ The second question presented is whether, assuming defendants assert a valid double jeopardy claim, that claim is frivolous within the meaning of *United States v. Dunbar,* 611 F.2d 985 (5th Cir. 1980) (en banc). This Court is of the opinion that defendants' double jeopardy claim is frivolous. *Dunbar* provides little guidance to the Court in its determination of whether a double jeopardy claim is frivolous. In *Unit-*

---

**4.** 2 Wright and Miller, Federal Practice and Procedure § 469 (1969). ". . . There is no immediate appeal, however, if the trial court has ordered a new trial, since there is no sentence to be appealed, but in such a situation the denial of acquittal, and grant of a new trial, is reviewable on appeal from a judgment following conviction in the second trial."

**5.** The Court emphasizes once again that it does not conclude that no double jeopardy claim could be raised by these defendants. The

Court only concludes that at this point in the proceedings a valid double jeopardy claim could be based upon bad faith prosecutorial overreaching, *United States v. Opager, supra*; or lack of manifest necessity, *United States v. Downum, supra*; but not the insufficiency of the evidence. Defendants are simply attempting to have the denial of their motions for judgment of acquittal reviewed on double jeopardy grounds because they would not otherwise be reviewable at this time.

*ed States v. Dunbar, supra* at 988, the Court states:

"District courts are not strangers to making a determination of whether matters are frivolous. See 18 U.S.C.A. § 3148 (denial of bail if appeal is frivolous); 28 U.S.C.A. § 1915(a); *Coopedge v. United States*, 369 U.S. 438, 433–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962) (denial of leave to appeal in forma pauperis if appeal is frivolous)."

This Court has reviewed 18 U.S.C. § 3148 and 28 U.S.C. § 1915(a) and cases discussing the issue of frivolousness. In its review, the Court found that frivolous does not necessarily mean without merit[6] but whether the issue is not insubstantial, *Leary v. United States*, 431 F.2d 85, 89 (5th Cir. 1970), is fairly debatable, 3 Wright & Miller, Federal Practice and Procedure: Criminal § 767 (1969); or of arguable merit factually and legally, *Watson v. Ault*, 525 F.2d 886 (5th Cir. 1976).

As defendants stated in their motion to dismiss for prior jeopardy or in the alternative motion for judgment of acquittal, at ¶ 12, "The central issue is . . . whether the trial court should have granted defendants' Motions for Judgment of Acquittal and sent the case to the jury in the first place."

Fed.R.Crim.P. 29(a) provides that the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

"The prevailing rule has long been that a district judge is to submit a case to the jury if the evidence and inferences therefrom most favorable to the prosecution would warrant the jury finding the defendant guilty beyond a reasonable doubt."

*Burks v. United States, supra* 437 U.S. at 16, 98 S.Ct. at 2150. Whether the evidence is sufficient to find guilt beyond a reasonable doubt has been stated conversely as

". . . whether . . . reasonable minds could conclude that the evidence is inconsistent with any [reasonable] hypothesis of the accused's innocence."

*United States v. Alfrey*, 612 F.2d 180 at 185 (5th Cir. 1980).

Defendants' primary contention is that the Government has failed to show anything more than mere presence. They rely on decisions of the Court of Appeals for the Fifth Circuit holding that mere presence at the scene of a crime is insufficient to support a conviction for conspiracy or possession. *United States v. Littrell*, 574 F.2d 828 (5th Cir. 1978); *United States v. Salinas–Salinas*, 555 F.2d 470, 473 (5th Cir. 1977); *United States v. Owen*, 492 F.2d 1100 (5th Cir. 1974); *United States v. Cantu*, 504 F.2d 387 (5th Cir. 1974); *United States v. Ferg*, 504 F.2d 914, 917 (5th Cir. 1974); *United States v. Duke*, 423 F.2d 387 (5th Cir. 1970); *Guevera v. United States*, 242 F.2d 745 (5th Cir. 1957).

The Government, on the other hand, argues that everyone on the Marina property must have been involved in the offloading and that there is "presence plus" additional circumstances. The Government relies upon *United States v. Butler*, 611 F.2d 1066 (5th Cir. 1980); *United States v. Delgado*, 615 F.2d 294 (5th Cir. 1980); *United States v. Edmonds*, 611 F.2d 1386 (5th Cir. 1980); and *United States v. Alfrey*, 612 F.2d 180 (5th Cir. 1980).

In considering whether the evidence is sufficient to submit to the jury, each case must stand distinctively on its own facts. This Court concludes that the Government presented sufficient evidence from which the jury could reasonably have concluded that the defendants committed the narcotics offenses charged beyond a reasonable doubt. The Court further finds that the defendants' claim that the evidence is insufficient is not fairly debatable or of arguable merit.

Essentially, no distinction can be drawn between these defendants, except Robert

---

**6.** But see *United States v. Dunbar, supra*; compare the language at 988 (colorable claim) with the language at 989 (if appeal found meritorious or not to have merit).

Jones, who was seen running from the area of the conveyor belts and was injured when he dove into the water. Otherwise, the evidence that applies to one applies to all.

The evidence presented by the Government shows a long term investigation of the Intercoastal Marina involving undercover police work and the use of two informants. On December 19, 1979, surveillance at the Marina indicated that an offloading operation was taking place. This offloading was observed by two Customs officers through night vision goggles, and CPO Montalvo candidly admitted that he could not positively identify any individual as participating in the offloading as he could see only forms and not faces. Shortly after 9:00 p.m., the Government secured the area and arrested everyone present.

### A. *Conspiracy Count*

■ In this case as in many conspiracy cases, there is no direct conclusive evidence of a conspiracy. There is substantial circumstantial evidence, however, that a conspiracy existed, that the defendants had knowledge of it, and that with that knowledge they knowingly and wilfully became members of the conspiracy.

■ The totality of the circumstantial evidence indicates a well orchestrated criminal conspiracy to possess marijuana with the intent to distribute it. *United States v. Butler, supra* at 1972. Given the existence of a conspiracy, each defendant's participation in the crime must be established by evidence which a jury could conclude rules out any reasonable hypothesis of innocence. *United States v. Butler, supra* at 1072; *United States v. Soto*, 591 F.2d 1091, 1102, cert. denied, 444 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979).

Defendants' presence at the Marina, itself in a remote area, at 9:00 p.m. on a cool Wednesday night, the 19th of December, in the midst of a large scale unloading operation involving five 18-wheel trucks, one 125-foot boat and electric conveyor belts, combined with the odor of marijuana, the light dress of defendants (See Government Exhs. 80, 81, 82, 83, 84, 85, 87), the small area in which the defendants were located, the paucity of traffic observed entering or leaving the Marina, and the relative security of the Marina by posted guard and safety tape are sufficient evidence for the jury to conclude beyond any *reasonable* hypothesis of innocence that these defendants were participants in the conspiracy.[7] *United States v. Butler, supra* at 1073; *United States v. Delgado, supra* at 297; *United States v. Edmonds, supra* at 1389.

### B. *Possession Count*

■ The evidence which connects the defendants to the conspiracy also supports a finding that they possessed marijuana with the intent to distribute it. The defendants all had marijuana sufficiently within their control to be in constructive possession and the amount of marijuana possessed is sufficient to permit the jury to infer an intent to distribute it. *United States v. Butler, supra* at 1073; *see United States v. Delgado, supra* at 297; *United States v. Edmonds, supra* at 1389; *United States v. Alfrey, supra* at 185–186.

None of these defendants was merely present at the scene. Under the totality of the circumstances, the evidence is sufficient for a jury to find beyond a reasonable doubt and to the exclusion of every *reasonable* hypothesis of innocence that these defendants conspired to possess marijuana with the intent to distribute it and possessed marijuana with the intent to distribute it.

### CONCLUSION

It is therefore ORDERED, ADJUDGED and DECREED that this Court's Order of June 11, 1980 is SUPPLEMENTED as set forth herein.

---

7. The Court notes that indictments charging a conspiracy to violate the Drug Control Act "do *not* require allegations or proof of an overt act." *United States v. Rodriguez*, 612 F.2d 906, N. 37 (5th Cir. 1980) (en banc). Accordingly, a person is a participant in a conspiracy if that person has knowledge of the conspiracy and knowingly and willfully becomes a member of the conspiracy.